INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS, LOCAL NO. 393, et al. v. MISSOURI PAC. FREIGHT TRANSPORT CO. et al.

No. 4527.

Court of Civil Appeals of Texas. Beaumont. Texas.

Feb. 12, 1949.

Rehearing Denied March 23, 1949.

On Motion to Dismiss April 14, 1949.

Combs & Dixie, of Houston, for appellants.

Alto Watson and Charles Pipkin, both of Beaumont, and Kelley, Lockett & Lockett, of Houston, for appellees.

Mullinax, Wells & Ball, Dallas (L. N. D. Wells, Jr., Dallas, of counsel), amicus curiae.

WALKER, Justice.

Appellees were plaintiffs in the trial court and appellants were defendants.

Plaintiffs are: (1) Guy A. Thompson, trustee of the Beaumont, Sour Lake & Western Railway Company (a Texas railroad corporation) acting under appointment by the United States District Court for the Eastern District of Missouri; and (2) Missouri Pacific Freight Transport Company, a Texas corporation, operating as a motor carrier over the public highways.

Defendants are: (1) the members (sued as a class) of Local Union 393 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America; (2) Lee Cascio and R. B. Bunch, individually and as members and officers of said Local Union 393; and (3) four named members of said Local Union.

Another party to the controversy out of which this suit arose is Mrs. C. T. Heisig, a feme sole, who conducts a local cartage and warehouse business in the city of Beaumont, Texas, under the assumed name of Heisig Transfer & Storage Company. This business is operated by Mrs. Heisig's son-in-law, John Price, who holds the position of manager of the Heisig Transfer & Storage Company.

For convenience, we shall hereafter identify Guy A. Thompson, the trustee, with the B. S. L. & W. Ry. Co., and shall refer to both as *Railway*. Plaintiff Missouri Pacific Freight Transport Company is referred to hereafter as *Transport*, and the members of Local Union 393 as *Union*. Heisig Transfer & Storage Company is referred to as *Heisig*.

Plaintiffs brought this suit to abate, by injunction, a picket line which Union had established at plaintiffs' freight depot in Beaumont. The original petition was filed by Transport. This pleading was amended, and Railway became a plaintiff. Plaintiffs prayed for a temporary injunction, restraining the picketing of their depot; this prayer was heard by the trial court and after much proof had been introduced by the

er much proof had been introduced by the various parties, the injunction was granted. It is not involved on this appeal, but the parties agreed that the merits of the cause should be adjudicated upon the evidence admitted at this hearing, and on this proof depends the final decree rendered in this cause. After the temporary injunction issued, plaintiffs again amended their petition, and the cause was determined under this pleading and that of the defendants, to which we refer below.

Plaintiffs alleged in their final amendment that each was a common carrier for hire, Railway operating in both interstate and intrastate commerce and Transport in intrastate commerce only; that Railway owned and used the aforesaid freight depot, located at 540 Neches Street in Beaumont, Texas, and that Transport also used this depot, under and by virtue of a contract with Railway; that freight carried, or to be carried, by each plaintiff was deposited at this depot and that this depot constituted the only such place of deposit each plaintiff had in Beaumont. The allegations make it plain that plaintiffs' free use of this depot was essential to the conduct of plaintiffs' business in the city of Beaumont. Plaintiffs alleged further that a labor dispute existed between Heisig and Union, to which they were not parties; that there is no dispute between plaintiffs and their own employees; that all of Railway's employees belong to labor unions other than defendant Union; that many of Transport's employees belong to unions forming a part of the organization with which defendant Union is affiliated, which have been recognized as the collective bargaining agents of said employees, and with which Transport has a contract yet in force; and that no labor dispute exists between plaintiffs and defendant Union. Plaintiffs alleged further that each had a contract with Heisig, made before Union's dispute with Heisig arose and which was yet in force, under which Heisig agreed to and did "pick up—freight from said depot, and deliver (it) to the consignee thereof in Beaumont, Texas, and pick-up local small lots of freight in Beaumont—and deliver (it) to the aforesaid—depot"; that under this contract Heisig was an "independent contractor"; that "Plaintiffs have no right to control any of

the operations" of Heisig and that plaintiffs had no "control over the employment, or the hiring and firing of (Heisig's employees) or the condition of their employment, or the wages to be paid them", and that "Plaintiffs are not capable of giving to the Defendants—any relief in their labor dispute" with Heisig. Nevertheless, alleged plaintiffs, defendants, knowing all of these things and knowing too that Transport's employees belonging to the labor organization with which defendant Union was affiliated had the right under their contract with Transport to refuse to cross a picket line, had established the aforesaid picket line at plaintiffs' said freight depot; that Transport's truck drivers and the drivers of many other persons, including freight consignees had refused to cross said picket line; and that plaintiffs' business had been greatly diminished and interfered with as a result, to plaintiffs' damage, all as defendants had intended. Plaintiffs alleged that the depot was separated from Heisig's place of business by a distance of ten city blocks, and that Heisig had no office, kept no records, and had no place of business at said freight depot. Plaintiffs alleged further that the picketing of the freight depot was unlawful and that it should have been restrained because: (a) Defendants' purpose in establishing this picket line at the freight depot was to coerce plaintiffs, through injury to their business, into demanding of Heisig (on pain of having plaintiffs terminate Heisig's contract if Heisig refused this demand) that Heisig sign a contract with Union which recognized Union as the exclusive bargaining agency for Heisig's employees; (b) such picketing, under the circumstances of this case, was secondary picketing and violated the anti-trust laws of Texas, and (c) violated the provisions of Article 5154f of Vernon's Texas Civil Statutes 1948. Plaintiffs alleged that defendants were unable to respond in damages and that their damages were irreparable, and they prayed that the picketing be enjoined.

Defendants filed in response a plea in abatement and an answer. They plead in abatement that the parties to this suit were in interstate commerce, were governed by the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq., a Federal statute, and that under this Act, only the National Labor Relations Board, and not the plaintiffs, had any right to injunctive relief, if the facts would support such relief. Defendants' answer contained various denials and admissions which need not be set out; and specially alleged that Heisig's truck drivers had selected Union as their agent for the purposes of collective bargaining, but that Heisig had wrongfully refused to recognize Heisig as such agent; that Heisig's employees had therefore struck against Heisig, and the picketing complained of by plaintiffs, in which the pickets carried placards stating that employees of Heisig were on strike, was a lawful incident of, and a peaceable and truthful publication of matters concerning said strike, confined to the public street and involving no trespass upon the property of others. Defendants further alleged that "Plaintiffs, especially the—Missouri Pacific Transport Company and the Heisig Transfer & Storage Company, have constituted themselves a single economic unit, with a single place of operation, inseparable and inaccessible to either without approaching both, and by virtue thereof Defendants allege that the said docks at (the freight depot) is the site of their employment so that the expression of free speech by means of picket signs in the vicinity thereof is privileged as being at the site of the labor dispute." Defendants alleged further: "Defendants do not assert any intention of maintaining pickets at or near the premises at 540 Neches Street except insofar as there occurs at said location, business operations by their employer, Heisig Transfer & Storage Company and hereby in open court judicially acknowledge · and assert their intent to withdraw the said pickets instantly upon the withdrawal by the said Heisig Transfer & Storage Company from the said location." Defendants invoked the rights of free speech, free assembly and immunity from involuntary servitude, as guaranteed to them by the Constitutions of the United States and of Texas. They plead further that the rights of the parties were governed by the Labor Management Relations Act of 1947.

As heretofore stated, when the merits of the cause were tried, the parties introduced again the proof which they had adduced at the hearing of plaintiffs' prayer for a temporary injunction; and on this proof, the trial court enjoined defendants from picketing "at, near and in the vicinity of" the aforesaid freight depot "and from exhibiting pickets or picket signs at, near or in the vicinity of the entrances of said freight depot and premises", and from doing other matters which need not be set out because these matters were only incidents of the picketing restrained. This injunction was made "permanent during suchtime that the enjoined actions are done or threatened by reason of any labor dispute—between (Union) and Heisig—, during such —time as there exists no controversy between (Railway) and/or (Transport) and the majority of the employees of either, concerning wages, hours or conditions of employment."

Defendants have appealed from this decree.

### Conclusions of Fact

We make the following conclusions of fact as a basis for our judgment.

I. The controversy out of which this suit arose centers around the building and premises in Beaumont, Texas, known as the Missouri Pacific Freight Depot. This property is owned by Railway, but it is used by Transport, as well as by Railway, as a place to receive and deposit temporarily freight which plaintiffs bring into or carry out of Beaumont. It is not a storage warehouse. We infer that plaintiffs have no other place in Beaumont where they can transact this part of their business. Railway maintains a small staff of employees who occupy offices in this building, established for their use, but most of the structure is used as a place of deposit for plaintiffs' freight. A part of the building, at the rear, is rented to the Universal Carloading Company, a concern which is not involved in the present controversy; but with this exception, the building and premises are in Railway's possession and are under Railway's control.

The depot itself is a long, narrow, rectangular structure. The front of this building faces, adjoins and opens upon Neches Street, and the building extends back from Neches Street a considerable distance. It is sometimes referred to in the proof as 540 Neches Street. The front may be said to constitute the eastern end of the building. Three of Railway's tracks extend along the northern side of the building either in, or adjacent to, a public street, and these tracks end at a line which is an extension of the line of the front of the depot. Two other tracks of Railway's run up toward the rear of the depot from the west, and end a short distance west of the rear, that is, the western end of the building. Freight comes into the depot from cars moved on to these tracks, probably the three northern tracks. To remove freight from or to deposit freight in this depot, trucks approach the building either from the south along Trinity Street, a dead end street one-half block long which ends opposite the rear of the depot, or else approach along an alley which extends along the southern side of the depot and which intersects Trinity Street; the front entrance of this alley is on Neches Street. Carload lot shipments of freight are left in Railway's cars, which are stored on the tracks referred to above, apparently more often on the tracks which stop just west of the depot. Access to cars upon these tracks may be had over ways open to the public. As stated, the northern tracks are in or adjacent to a public street and the tracks leading to the rear of the depot adjoin a way which Railway had paved with shells. Carload lot shipments were taken by Beaumont consignees directly from these cars into their own vehicles. Shipments of less than a car load in size were taken into the depot, either from Railway's cars or from Transport's trucks, and were removed from the depot (at least in the very great majority of instances) in trucks which came up to the depot along the alley referred to above or along Trinity Street. Doubtless these two ways were also used by Heisig in delivering freight to the depot as hereinafter related.

At some time on Thursday, October 30, 1947, apparently during the morning, Union placed two pickets in the vicinity of

the freight depot. One picket walked back and forth along the Neches Street sidewalk in front of the depot, and the other picket walked back and forth across the opening of Trinity Street immediately south of the rear of the depot. These two pickets thus crossed both of the truck approaches to the depot. If a truck did come up to the rear of the depot from the west over the way along Railway's tracks, this truck would have evidently come into the presence of the picket crossing the opening of Trinity Street, although that picket would not have crossed the path of this truck. However, this way was not often used by trucks, before the present controversy arose, to gain access to the depot (except, perhaps, occasionally), and there is no proof that it has been used as an entrance to the depot since that time.

The stations of the pickets did not cross the railroad tracks, and the pickets did not go near those tracks. Railway's use of the tracks has not been interfered with by the picket lines.

These pickets maintained their stations during business hours each day (that is, each business day) subsequent to October 30th, until the trial court granted plaintiffs a temporary injunction 9 days later, on November 8, 1947.

These pickets were emplaced by Union, acting through Lee Cascio, Union's Business Agent, as a consequence of and pursuant to the strike called against Heisig by Union on Tuesday night, October 28, 1947, as related hereinafter.

No more than two pickets were on station at any one time (although several members of Union had been appointed by Cascio to serve as pickets when called); and the two pickets were separated by distance of some 500 feet. Each carried a placard bearing these words: "Heisig Storage & Transfer Company on Strike, Teamsters' Local 393, A.F. of L."; this statement was truthful. Each picket confined his patrol to the public way, namely, within the bounds of Trinity Street and along the Neches Street sidewalk; and the conduct of the pickets has been lawful at all times. The pickets have done nothing more than patrol their stations, carrying their placards as they walked. Cascio testified: "Before placing the picket line at any point, these men were notified at that time that they were to peacefully picket and not to bring any harm to anyone else across that picket line, or any abuse by language, or anything else." Further: "The pickets were instructed not to stop and talk to anyone, or to talk with anyone that might approach them. Q. And have they carried out your instructions, so far as you have been able to see? A. Yes, sir." He said that the pickets did not block traffic; that "we haven't attempted to stop anyone from crossing that picket line"; and that the only conversation the pickets had with drivers of trucks not belonging to Heisig was to say Good morning "and if they would ask us who is on strike we would tell them". Two of the pickets, Roan and Joseph, confirmed some of Cascio's statements. There is no competent evidence to the contrary, nor any real effort to dispute Cascio's statements, and we find that his testimony stated the facts.

Heisig maintained an office and warehouse at 955 Pearl Street in Beaumont, and this place of business was 10 city blocks distant from plaintiffs' freight depot.

Union also picketed Heisig's office and warehouse during the time they maintained pickets at the freight depot.

II. Union is a voluntary, unincorporated association of working men, presumably members of the crafts referred to in Union's title, and is affiliated with and forms a part of an association of similar Unions styled The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Union's office seems to be in the city of Beaumont, and Union has approximately 450 members.

Lee Cascio is Union's chief executive officer. He is referred to in the proof as Union's business representative, and he also holds the office of Secretary & Treasurer of Union. R. B. Bunch is his assistant.

III. Beaumont, Sour Lake & Western Railway Company, referred to herein under the term *Railway*, is a Texas railroad corporation which owns certain railway lines and other properties situated wholly

within the State of Texas. The most important element of its lines is a railway between Houston and Beaumont; most of the freight carried by it moves over this track. It is engaged in both interstate and intrastate commerce; it apparently carries more goods in interstate than in intrastate commerce. As stated, the freight depot at Beaumont, about which centers the present controversy, is one of its properties.

When the proceedings were had in the trial court, Railway was the debtor in cause No. 6935, a proceeding for the reorganization of said company which was pending in the United States District Court for the Eastern District of Missouri, Eastern Division. Plaintiff Guy A. Thompson was acting in this proceeding as trustee for Railway.

IV. Missouri Pacific Freight Transport Company, referred to hereinafter as Transport, is a Texas corporation which was organized for the purpose of operating, and which was functioning, as a motor carrier of freight, for hire, over public highways of Texas, between certain points upon those highways which were not fully identified in the proof but which include Houston, Beaumont and Orange. Transport's operations as a carrier were authorized by certificates from the Texas Railroad Commission and the Interstate Commerce Commission.

Transport's business, however, is wholly intrastate. There was proof that its carriage of freight in interstate commerce had been enjoined.

V. The nature of the legal relation between Railway and Transport was not directly proven (Beckley, plaintiffs' Beaumont Freight Agent, once referred to Transport as a "subsidiary of the railroads"), but the evidence showed conclusively that these two corporations functioned as a unit, intended to provide and actually providing shippers and consignees of freight with the complete and flexible means of transportation which neither plaintiff could provide alone. All interstate shipments and some intrastate shipments were brought into and were carried out of Beaumont by Railway; but Railway could not carry a substantial volume of intrastate shipments which were less than a carload in size (referred to in the proof as L.C.L. shipments) as speedily or as cheaply as such freight could be carried in motor trucks over the highway, and Transport's function was to supplement Railway's service by furnishing motor carriage of intrastate L.C.L. freight. Johnson, Railway's Assistant Division Superintendent (of the Division in which Beaumont lay), testified that freight shipped from Houston to Beaumont would arrive in Beaumont about 15 hours earlier if it were carried by Transport instead of by Railway. It was also in proof from Johnson and from Beckley, plaintiffs' Beaumont Freight Agent, that it was cheaper to move Houston L.C.L. freight to Beaumont by truck instead of by rail. These circumstances were controlling in determining the method of transporting L.C.L. shipments between Houston and Beaumont and doubtless were so in other instances of intrastate carriage. This testimony accounts for Transport's existence and, with the details of plaintiffs' working arrangement, now to be related, show Transport and Railway to be parts of a single agency of transportation.

Both Railway and Transport, with still other transportation agencies not identified in the proof, are referred to under the trade-name "Missouri Pacific Lines". These words appear upon the front of plaintiffs' freight depot in Beaumont.

Frank L. Evans, who resides in Beaumont, testified that he was the General Agent of the Missouri Pacific Lines, in which he included both plaintiffs, and that he solicited business for both of the plaintiffs.

Transport's part in its mutual business with Railway seems to have been limited to the operation of the trucks which carried plaintiffs' freight.

Transport used Railway's stations and freight docks.

Railway's office personnel also acted for Transport and did the accounting which plaintiff's business required. There was some proof (from Beckley) that Railway's auditors at Kingsville audited the accounts kept by Railway's depot staff and appor-

tioned to Transport its share of the total income. Johnson, Railway's Assistant Division Superintendent, testified that Transport has "no office on any division" of Railway's. "They have no office force on any division. The railroad handles it on my division. Q. The railroad force handles all the business of the Transport Company, is that right? A. That's right."

Charles E. Beckley, who was Railway's Freight Agent at Beaumont, testified that he was also the Beaumont Freight Agent of Transport. He said: "I am their Agent (Transport's) for bill of lading purposes", as he was for Railway. Concerning bills of lading he testified: " * * * the Transport Company have a bill of lading that is headed 'Missouri Pacific Transport Company', but due to a diversion in rates it is very seldom used. The truck rate was higher for sometime. I understand now that they have been equalled, and unless a man comes in and demands a Missouri Pacific Transport bill of lading we give him a bill of lading of Beaumont, Sour Lake & Western which we can use on the railroad or on the transport, either."

Beckley said that Transport had no office in Beaumont, that Transport had the right to come into the Beaumont Freight depot "and use the docks for the purpose of delivering and picking up freight for transportation to the highway. They don't maintain any personnel there of their own organization." He did not know whether Transport maintained an office at any place. "Q. What it comes to is that the corporation is a department of the railroad company, isn't it? A. I couldn't say. They work with the railroad company."

Beckley's staff kept only one set of records for the business done by Railway and by Transport. These records were simple, consisting only of a daily manifest and of a report sent in monthly to Railway's auditors at Kingsville, which seems to have either consisted of or more probably to have been accompanied by the waybills accumulating during the month. Beckley testified: "Q. * * * you handle your business differently between the two Plaintiffs in this case, do you not? A. No, sir. I keep one set of accounts. Any distribution of the proceeds of charges, freight charges or any transportation charges, is handled by the Auditing Department, which is located at Kingsville, Texas—. Q. Whatever accounting they (that is, Plaintiffs) make among themselves—. A. —is beyond my knowledge or information of anything pertaining to it." He said that he retained the daily manifest but, as stated, sent the waybills to the Auditor's office. These waybills were forms which seem to have indicated which of the plaintiffs carried the shipment as well as reciting other information concerning the shipment covered by the bill.

Beckley selected which of the plaintiffs should carry the freight coming into the depot for shipment out of Beaumont. (Subject, doubtless, to the limitations upon the character of business of the particular carrier to which reference has been made.) He made no attempt to prefer one plaintiff over the other, but simply chose the speediest and most economical method of transportation available to him at the moment.

VI. Heisig Transfer & Storage Company was, as we have stated, only a trade-name which had been assumed by Mrs. C. T. Heisig under which to conduct a general cartage and drayage business within the city of Beaumont. She also maintained and operated under this trade-name a warehouse in Beaumont for the storage of property. The active manager of Heisig was John Price, Mrs. Heisig's son-in-law. Mrs. Heisig herself was an elderly woman and we infer that she had little to do with the details of Heisig's business. As stated, Heisig's office and warehouse were located at 955 Pearl Street in Beaumont, 10 city blocks distant from plaintiffs' freight depot.

In conducting its business Heisig owned and used several motor trucks and employed several persons to drive these trucks and some other persons to serve the drivers as helpers. The evidence does not show how many trucks Heisig operated, but it is in proof that all of these drivers and helpers and that Heisig's warehouseman had become members of Union prior to the time Union's agent, Cascio, attempted to negotiate with Price, as is hereinafter related, and according to the applications of these men which Cascio had with him then there must have been six drivers and helpers in

Heisig's employment at that time, in addition to the warehouseman.

Heisig seems also to have had at least one other employee, but the proof does not show what other employees Heisig had nor what their duties were. This lack of proof is immaterial since Union purports to act only for the drivers, helpers and warehouseman referred to above.

Price, in his testimony, lists various concerns for whom Heisig performed cartage servcies, and he referred to various sorts of cartage work done by Heisig. However, it is apparent that Heisig's most important customers were plaintiffs and that most of Heisig's cartage work was done for plaintiffs. Price testified that about 30% of Heisig's profit was earned and that about 50% (probably a little less than 50%) of Heisig's truck movement took place in carrying freight to plaintiffs' freight depot from the places of business of Beaumont shippers and in carrying freight from that depot to plaintiffs' Beaumont consignees.

VII. Heisig's relation to plaintiffs, and the rights and duties of Heisig and plaintiffs in the conduct of their mutual business, were defined by two written agreements, each dated May 18, 1945. One agreement was between Heisig and Railway, and the other, between Heisig, Railway and Transport. There is a latent ambiguity in this second agreement, arising out of the reference therein to the word "carrier" which is said therein to have been used in the first agreement but which, in fact, does not appear in the first agreement. However, by "carrier" the parties evidently intended Railway, and we construe the second agreement as making the terms of the first agreement run between Heisig, Railway and Transport instead of between the first two only. Under the contract between the parties, as thus defined, Heisig agreed with plaintiffs to carry plaintiffs' L.C.L. freight from their Beaumont depot to their Beaumont consignees, and to carry to plaintiffs' depot from places in Beaumont L.C.L. freight which persons in Beaumont wanted shipped over plaintiffs' lines. For this service plaintiffs agreed to pay Heisig 14 cents per hundred pounds of freight carried by Heisig. Heisig was required to pay the costs of its operations. The contract as written specified no term during which it should exist; it was terminable by plaintiffs at their election if Heisig's performance proved unsatisfactory, and by plaintiffs, or by Heisig, upon 30 days' written notice to the other party. Heisig is referred to in the contract as "independent contractor" and plaintiffs reserved no control over the way and manner in which Heisig was to move the freight delivered to it, but since Heisig's duties, according to the contract and according to the evidence as well, were limited to the performance at plaintiffs' direction of plaintiffs' (not Heisig's) contracts of affreightment, many of which were initiated in behalf of plaintiffs by Heisig, it is apparent that Heisig was plaintiffs' agent in doing this work and was not an independent contractor. The evidence, referred to below, shows that practically all contracts of affreightment entered into by plaintiffs with their Beaumont shippers originated in a transaction between the shipper and Heisig.

The following provisions of the first agreement are material here; the word "contractor" signifies Heisig and the words "railroad company" are to be taken as signifying both plaintiffs and not Railway only:

"Agreement With Contractor for Trucking Less-Than-Carload Freight

\*      \*      \*      \*      \*      \*

"Whereas, the Railroad Company may from time to time put into effect certain tariffs under the terms of which it will provide truck service for the transportation of less-than-carload freight between its freight depot and cars at Beaumont, State of Texas, and Consignors' and Consignees' locations within the area prescribed in said applicable tariffs, and the Contractor desires to perform so much of said service as the Railroad Company *may request:*

"Now, therefore, the parties hereto hereby agree as follows:

"1.  General Provisions

"Class of Service

"(a) The Contractor, *when notified so to do by an authorized agent of the Railroad Company,* shall promptly transport from the Railroad Company's depot and cars in the aforesaid city to any consignee's resi-

dence, store, factory, warehouse or other place of business located in or near said city, all less-than-carload freight of every kind and nature whatsoever billed to such consignee and deliver the same to such consignee at the place where such shipments are usually unloaded, and likewise shall transport all less-than-carload freight which any shipper may desire to have transported over the rails of the Railroad Company from the residence, store, factory, warehouse or other place of business of such shipper (from the place where such shipments are usually delivered to truck or drayman) to said freight depot or to cars designated by said agent of the Railroad Company. Except as may be otherwise provided by tariff, all loading and unloading of such freight shall be done by the Contractor at the Contractor's sole expense.

\*　\*　\*　\*　\*　\*

"Independent Contractor

"(b) The Contractor shall employ and direct all persons performing any service hereunder and such persons shall be and remain the sole employes of and subject to the control and direction of the Contractor and not the employes or subject to the direction and control of the Railroad Company, it being the intention of the parties hereto that the Contractor shall be and remain an independent contractor and that nothing herein contained shall be construed as inconsistent with that status. The Contractor promises and agrees to conduct the work in the name of the Contractor and agrees not to display the name of any advertisement of the Railroad Company upon or about any of the Contractor's vehicles.

"Receipts

"(c) The Conrtactor shall give receipts to shippers for all shipments received, furnishing the Railroad Company with copies thereof, and shall take receipts in duplicate, from all consignees for shipments delivered and give a copy of such receipts to the Railroad Company. The Railroad Company shall give receipts to the Contractor upon delivery of all freight to the Railroad Company, and the Contractor shall receipt to the Railroad Company for all freight delivered to the Contractor by the Railroad

Company. Receipts shall be on forms prescribed by the Railroad Company and shall carry notations as to the apparent condition of the freight at the time of receipt or delivery, if in other than good condition. Subject to instructions from the Railroad Company, no deliveries of freight shipped on order bills or on straight bills of lading subject to delivery orders shall be made by the Contractor until after the original order bills of lading or delivery orders, properly endorsed, have been surrendered to the Contractor. The Contractor shall promptly deliver to the Railroad Company all such original bills of lading and delivery orders, properly endorsed, surrendered by any consignees on delivery of any freight handled hereunder.

"Collections

"(d) When requested so to do, the Contractor shall collect and pay to the Railroad Company's agent, on the same day collected, whenever feasible, but in any event not later than noon of the next succeeding day, all charges with respect to such freight and all invoices on C.O.D. shipments, as shown on freight bills. The Contractor shall furnish receipts for any sums so collected on forms and in the manner prescribed by the Railroad Company.

"Should the Contractor be unable to make such collections on inbound freight, the Contractor shall return the shipment to the Railroad Company at point designated by its agent and receipt shall be given to the Contractor therefor.

"All collections shall be made in cash unless otherwise authorized in writing by the Railroad Company. The Contractor in no case shall be liable for the payment of checks or forms of payment other than cash accepted by him under such written authorization.

"In the event that the Contractor violates the provisions of this sub-paragraph (d) the Contractor shall be directly responsible to the Railroad Company for such freight charges and invoices and the Railroad Company will in such case deduct the same from any amounts due the Contractor under any settlement as hereinafter provided. The Railroad Company shall not be required to exhaust its remedies against the

person or persons primarily liable for said freight charges.

\* \* \* \* \* \*

"Term

"(f) This contract cancels and supplants any and all other agreements and understandings for trucking between the Railroad Company and the Contractor covering the transportation of the aforesaid freight and shall take effect as of the day first above written, and shall remain in effect thereafter until terminated by either party giving not less than thirty (30) days' written notice to the other party, provided that the Railroad Company may terminate this agreement at any time immediately upon written notice to the Contractor by reason of any adverse legislation, order or rule of any public authority, or in the event the Contractor's services hereunder shall be unsatisfactory to the Railroad Company.

"II. Indemnity

"(Herein Heisig agreed to indemnify Plaintiffs against loss from injuries to third persons and to property; against 'the issuance of any false or fraudulent bills of lading or delivery order or the giving or receiving (of same) for any freight or for freight charges by (Heisig) or any of (Heisig's) agents or employees;' against Heisig's failure to make collections or remittances to Plaintiffs, or Heisig's failure to take up and deliver to Plaintiffs order bills or delivery orders, as otherwise agreed; and against theft, embezzlement or defalcation by Heisig or its agents.

"The contract then provided: 'The Contractor's liability for freight handled hereunder while in the possession of the Contractor shall be that of an insurer, and the records of the Railroad Company as to the condition of freight when received by the Railroad Company from Contractor, or when delivered by the Railroad Company to the Contractor, shall be conclusive as between the parties hereto. Such freight shall be deemed to be in the possession of the Contractor until its delivery to and acceptance by the Railroad Company, or by the consignee, as evidenced by the giving or taking of the receipts hereinbefore provided."

"Heisig further agreed to comply with applicable statutes concerning Employer's Liability, Workmen's Compensation and Workmen's Insurance, and to indemnify Plaintiffs against loss 'due to the existence of such enactments.'

"Heisig further agreed to comply with other applicable laws and to indemnify Plaintiffs from 'all liability for any failure or default' in this behalf by Heisig.)

"III. Insurance

"(Plaintiffs were authorized to procure and keep in force for their own protection insurance against various forms of losses referred to above, and Heisig agreed to pay toward the cost of this insurance the sum of $1.25 out of each $100.00 earned by Heisig under the contract.)"

This contract was actually exclusive in the sense that plaintiffs employed no other person to perform such services as Heisig undertook to perform in this contract.

Plaintiffs had begun to furnish their Beaumont customers local pick-up and delivery service at the customers' places of business a number of years before this contract was made, and they seem always to have rendered this service through Heisig. Johnson, Railway's Assistant Division Superintendent, understood that Transport had had a contract with Heisig for this local pick-up and delivery service since Transport began to furnish that service in 1931. Price testified: "Q. How long has Heisig Transfer & Storage Co.,—been the local pick-up and delivery independent contractor for the Missouri Pacific? A. I don't know. I went down there in 1935 and they (he refers to Heisig) had the contract then."

Plaintiffs did not make an individual charge for this local pick-up and delivery service furnished through Heisig. This service was a part of the performance promised by them under their contracts of affreightment; the fee they charged was the legal tariff for a carriage of freight which included this local pick-up and delivery service. This appears from the preamble of the contract, and Johnson testified: "Q. Well, with reference to your local deliveries, it is the duty of the Railroad under the Interstate Commerce Com-

mission regulations to make local deliveries, is it? A. According to the tariff, yes, sir—according to the tariff we furnish free pick-up and delivery service unless the consignee wishes to perform the services themselves." He testified further: "Q. Are there any billings upon which the consignees call for their merchandise at the freight depot? A. On some occasions, yes, sir. Nothing preventing all of them from calling for it. Q. What is the tariff arrangement in that connection, for picking up his own merchandise? A. Consignee picking up his own merchandise is allowed 5 cents per 100 pounds for hauling his own merchandise."

Of course, it was to plaintiffs' financial advantage to procure this local pick-up and delivery service to be done as cheaply as possible, since the size of plaintiffs' share of the freight tariff depended upon the cost to them of this service. This could be assumed, but Johnson, in effect, so testified. He also testified that "we make a contract with the man that we can make it with, the most economical contract we can make." Beckley said that the contract with "the drayman is made on a competitive basis." If Price gave up his contract "We would advertise (for) a contract drayman, and anyone who had trucks could bid on that on a competitive basis, and the Railroad would—take the (lowest bidder) if they had facilities to handle it."

It was Railway's universal practice to farm out its local pick-up and delivery service to local contractors. Johnson testified: "I don't know of any on my railroad where we make our own deliveries. Q. You don't know of a single instance in which the railroad makes its own local pick-up and deliveries? A. I don't recall any, no, sir." Transport had done the same in Beaumont for years before this controversy arose, and both plaintiffs employed a local contractor in Orange.

Of plaintiffs' Beaumont competitors, which included the Southern Pacific Lines, the Kansas City Southern and the Santa Fe Lines, at least the first two furnished their Beaumont customers a local pick-up and delivery service equivalent to that of plaintiffs, but there is some proof from Beckley and Cascio (which is not very satisfactory) that these two carriers performed this service through their own employees instead of by farming it out as plaintiffs did.

The proof shows that plaintiffs were beneficiaries of low wage rates paid truck drivers and their helpers by Heisig. Cascio's testimony showed that Kansas City Southern's wage scale for truck drivers was $1.00 an hour, and that this carrier employed no helpers for the drivers. Cascio first said that Southern Pacific paid 90 cents an hour for drivers and 77 cents for helpers and $1.00 an hour for road drivers, but on learning Transports rate of pay, which was a little lower than Southern Pacific's, he corrected his testimony and said that Southern Pacific paid $1.05 an hour for road drivers. According to Cascio these drivers for these carriers were members of Union and were doing the same kind of work which Heisig's drivers and helpers did. Heisig's wage rates were lower. Price, Heisig's Manager, testified: "Q. Your hourly rate of pay out there is 50 cents an hour, as brought out before? A. That is for helpers when they first start, and they don't stay long enough to get a raise. They work three or four days and are gone. I have a large turn-over in helpers, except my regular employees and they get more than 50 cents an hour." Some of Heisig's striking employees testified as to their rates of pay. Roan, who seems to have been a truck driver, and to have worked for Heisig only a short time before the strike (how long, we cannot determine; Joseph said only one day, but Roan's testimony shows longer period) said that he was paid 50 cents an hour. Conley, who worked for Heisig more than a year before the strike, said that he was paid 50 cents an hour as a helper and that he was paid 58 cents an hour as a driver. Davis, who worked one day for Heisig after the strike had been called, said that he was paid $1.00 an hour as a driver, but he also said that for his day's work he was paid a total of $6.00 "and something". The evidence does not clearly show whether Heisig could have, or could not have, paid Union's wage scales and made a pro-

fit under the contract with plaintiffs. However, since Heisig had to pay the cost of Heisig's performance of the contract with plaintiffs and since plaintiffs made the cheapest contract that they could, it must be believed that Heisig's lower wage rate was a matter considered by Heisig in taking the contract from plaintiffs.

The testimony referred to shows two elements of competition into which Union members entered. In the first place, there seems to be competition between the type of service rendered through a contractor such as Heisig and the type of service rendered through a carrier's own employees such as was rendered by Southern Pacific and Kansas City Southern. On this record, the seriousness of such competition is problematical.

The second type of competition in which Union members were involved was what may be described as competition with plaintiffs and with Heisig for a larger share of the legal tariff charged plaintiffs' Beaumont shippers and consignees who made use of the local pick-up and delivery service. We assume that the tariff was registered with the Interstate Commerce Commission, and with the Texas Railroad Commission, and that plaintiffs had to pay the total cost of carriage, including Heisig's charges, out of this tariff. It was to Heisig's interest to keep its cost of operations as low as possible and it was to plaintiffs' interest to do the same, so that it appears that plaintiffs on the one hand, Heisig on the other and Union in the third place were disputing to some extent, at least, about how the fixed freight tariff should be divided among them.

The evidence shows that before Union struck against Heisig, Heisig's performance of the contract was satisfactory to plaintiffs; and the following evidence shows how the parties worked:

Johnson, Railway's Assistant Division Superintendent, said that when L.C.L. shipments were brought into Beaumont, whether by Railway or by Transport, "Our warehouse force unloaded it and segregated the shipments by consignees, and our contract pick-up and delivery man (that is, Heisig) handles it from the freight station and delivers it to the consignees". Some consignees carted their own freight, instead of having Heisig do it—doubtless to earn the 5 cents discount referred to above. Concerning freight shipped out of Beaumont, Johnson said that most of it was carted to the depot from the shippers' place of business, and Beckley's testimony shows that Beaumont shippers, because Heisig's connection with plaintiffs was widely known, generally notified Heisig in the first instance, instead of plaintiffs, that they had freight for plaintiffs; Heisig then picked up this freight and delivered it to plaintiffs at the depot. Beckley said: "Q. If a customer calls up and he has got a piece of freight he wants to ship say to Houston, it could go either by the Transport Company by truck or by railroad, couldn't it? A. Yes, sir it could. Q. Now then, if he called up, where would he call, to the freight house? A. Well, its pretty common knowledge in Beaumont that the Heisig Storage is our transfer drayman, and we get very few calls at the local freight office requesting pick-up and delivery of stuff. It is all made to Heisig Storage at his office on Pearl Street. I understand they keep a list over there as calls come in, take these calls, and in the afternoon when they start their pick-up service these lists are divided among their drivers, certain routes to be picked up. It is possible, not often but sometimes, someone will call the local freight and request a pick-up. That information is passed on to Heisig Storage Company, too, for Heisig Storage keep a record of their pick-up and delivery service in order to get their money from us." Further: "I have seen the information passed on (to Heisig by witness' own staff) and have also seen the warehouse foreman tell them to call Heisig Storage to keep from receiving the call and listing it."

There is some evidence respecting accounting and documents used in the mutual business of plaintiffs and Heisig which need not be set out. Heisig seems to have given plaintiffs receipts for the freight which Heisig received from plaintiffs for delivery, and to have gotten and kept in the Pearl Street office receipts from con-

signees for freight delivered to them. This accords with the contract. Price's testimony also shows that he collected large sums of money for plaintiffs. He said: "* * * when I deliver this freight the drivers turn in the money to my collector, he has to go up front (in the depot), sometimes he will have twelve or fifteen hundred dollars. He has to go to the office and turn it over to the cashier." Beckley testified concerning his own records of Heisig's performance: "Q. How do you keep records on Heisig? A. We have a printed form and that shows the way bill, date, pounds, the money that is picked up on deliveries. We have two separate reports, one used for delivery service and one for pick-up service. Q. Do you send them on to Kingsville too? (where Railways auditors are.) A. Yes, sir. They are negotiable. I pay the money out and send them to Kingsville to get credit on it so I won't be short in my accounts."

All exchange of freight between plaintiffs and Heisig took place at plaintiff's freight depot.

There is a good deal of proof in the record concerning Heisig's use of plaintiff's freight depot, raised by, and centering about defendant's argument that the depot was one of Heisig's places of business. Briefly, this proof shows that Heisig did *not* maintain an office at the depot, and that Heisig kept no records there. There was no garage at the depot for Heisig's trucks; Heisig left trucks at the depot but these vehicles were in a street. Heisig's office and Heisig's records were at its place of business at 955 Pearl Street, 10 blocks from the depot. Price did make such use of the office facilities at the depot as his business required, but so did other persons who had business at the depot with plaintiffs; the facilities used by Price belonged to Railway, as did the depot, and the office must be taken to be Railway's not Heisig's. Railway controlled the building, except that part rented to Universal Carloading Corporation; Johnson said that no space in the depot had been rented or leased to Heisig.

However, the proof shows that the depot was unquestionably one of Heisig's fixed places of business, which had existed for years before the present controversy arose and which would endure at least as long as the contract existed between Heisig and plaintiffs, and thus it must be said that this depot was one of the fixed places of work for Heisig's striking employes. This contract was made in May, 1945, over two years before the dispute arose between Heisig and Union, and contracts for service had existed between Heisig and plaintiffs for years prior to the date of the present contract. Furthermore, as we have stated, about 30% of Heisig's profit was earned and about 50% of Heisig's truck operations took place under this contract; all of these operations must have either begun or ended at the depot. We infer that Price, Heisig's Manager, spent much of his time at the depot. We note that when Cascio undertook to negotiate with Price, he found Price at the depot on both of the occasions when he talked to Price. Four of Heisig's former employes, either drivers or helpers, testified; each said that he was employed by Price at this depot to work for Heisig. One of these men, Willie Joseph, a helper testified: "Q. Tell the court where you would spend your time, where you would do your work. A. Most of it, the majority of it was spent at the Missouri Pacific freight house. Q. Did you spend any time at all working on anything else except freight at the Missouri Pacific? A. Since I have been there, two days." He had worked for Heisig from March, apparently, until the strike occurred. Another of these men, Ivory Conley, had worked for Heisig over a year before the strike, first as a helper and then as a driver. He said, in effect, that nearly all his time was used in hauling plaintiffs' freight. Price himself said that he had hired employes at the depot but did not remember how many.

Heisig was proved to have had, and always to have exercised sole control over its employes, their wages and hours of work, and their conditions of employment, exactly as the contract provided. Plaintiffs have never assumed to exercise any control over such matters. Price, Heisig's manager, testified that he employed and discharged Heisig's employes, fixed their rates of pay, and determined the number

of hours to be worked by them; and that he directed the work of these employes. He testified, in effect, that plaintiffs neither had, nor assumed to exercise, any control over his employes; that Mrs. Heisig owned Heisig's trucks, that Mrs. Heisig carried workmen's compensation insurance for the benefit of Heisig's employes and also carried public liability insurance covering Heisig's activities, that Mrs. Heisig paid for the gasoline and oil used in Heisig's operations, that Heisig was liable for damages sustained by plaintiffs' freight in his possession and that he (he is identifying himself with Heisig) carried insurance to protect Heisig against that liability. Johnson and Beckley confirmed Price's testimony respecting Heisig's control over its own employes and there was no evidence to the contrary. Beckley also said that neither plaintiff had any interest in Heisig's equipment, that none of Heisig's employes are carried on Railroad's payroll for any purpose, that he had no right to control the movement of Heisig's employes or the method and manner in which they did their work. "The only right I have is to demand service. As long as (Heisig) delivers our freight intact, I don't have anything to say."

VIII. The only labor dispute shown by the proof is the strike called against Heisig by Union. No labor dispute existed between plaintiffs and their own employes.

The proof shows that immediately before Cascio's attempt to negotiate with Price, as referred to below, all of Heisig's truck drivers and their helpers and Heisig's warehouse man had applied in writing for membership in Union and had apparently become members of the Union. These applications were introduced in evidence, and each designated Union as the applicant's "representative for purposes of collective bargaining, hereby revoking any contrary designation."

On the afternoon of Tuesday, October 28, 1947, Cascio (Union's Business Agent) went to Price, intending to procure Heisig's recognition of Union's status as the Collective Bargaining Agent of the aforesaid employees. Whether Cascio expected to subsequently negotiate upon other matters was not shown.

Price was at plaintiff's depot, apparently in the warehouse foreman's office when Cascio came up to him. The warehouse foreman and another person were in the room with Price, and Cascio was accompanied by his assistant Bunch. There is some dispute as to what was said and done on this occasion, and at the meeting on the next morning, referred to below. Cascio and Price each seemed to have thought that the other did not treat him with courtesy or fairness, but the proof shows at least the following facts, and these are the only details we need consider here, namely: Cascio informed Price that Heisig's employees had joined the Union and that he was appearing as their representative. He requested a private interview. Price refused the request and told him to proceed with the statement of what he had in mind. Cascio then produced the following document and after some preliminary explanation asked Price to read and execute it. This document read as follows:

"October 28, 1947.

Mr. Lee Cascio, Sec'y-Treas.,
Local Union No. 393
650 Franklin Street
Beaumont, Texas

Dear Sir:

Heisig Storage and Transfer Company, located at 955 Pearl Street, Beaumont, Texas recognizes Chauffeurs, Teamsters & Helpers Local 393 as bargaining agent for the Employees classified as Drivers, Helpers, Warehousemen, etc. This recognition comes as a result of checking signatures of the employees above named, with their signatures on the payroll.

Company agrees not to discriminate against any of the employees for joining the Union and not to take any disciplinary action against same.

Heisig Storage & Transfer Company
B: ————
It's: ————"

When Cascio handed Price this document, he had in his possession the applications referred to above, designating the Union as applicants' collective bargaining agent, and Cascio was prepared to exhibit these papers to Price as evidence that his request for recognition of Union as bar-

gaining agent was justified. Cascio said that he told Price this; Price does not refer to the matter.

Price read the document but declined to execute it at the time, requesting some delay for discussion with his principal, Mrs. Heisig, and for consideration of his course of action; and he and Cascio finally agreed to meet again at 10 o'clock the next morning. That night, Tuesday, October 28, 1947, the aforesaid Heisig employes held a special called meeting and either called a strike against Heisig or else authorized Cascio to set one in motion—doubtless if his negotiations with Price failed.

At 10 o'clock A.M. the next day, Wednesday, October 29, Cascio again went to Price, whom he again found at plaintiffs' freight depot, and asked Price whether he would sign the document copied above; and Price declined to do so. Cascio then, in effect, notified Price that a strike was called against Heisig and that he intended to establish pickets. According to Price, Cascio attempted at 4:30 that afternoon to arrange a meeting with Mrs. Heisig, but Price declined to make the arrangement, apparently because he thought this request (or as Price would put it, demand) involved some lack of consideration for Mrs. Heisig.

No further communication between Union and Heisig regarding the strike, nor any attempt by either to communicate with the other regarding this matter was shown. We are satisfied that Price's conduct is to be regarded as the conduct of Heisig, not only because Price was Heisig's manager and Mrs. Heisig's agent, but also because Price said, in effect, that he had told Mrs. Heisig of these matters; and Price's course of conduct shows that what he did was either approved by Mrs. Heisig in advance or was ratified by her afterwards, before Price testified on the temporary injunction hearing.

We do not understand that Price had any objection to the form of document copied above; nor do we see any to be made. The instrument is short and simple, and a request to sign it was simply a request that Heisig recognize Union as the collective bargaining agent of Heisig's truck operating personnel and warehouseman. We interpret the proof as showing: (1) that Union requested Heisig to recognize and deal with Union as the collective bargaining agent for Heisig's drivers, helpers and warehouseman aforesaid; (2) that Heisig refused to do so; and (3) that Union then struck against Heisig to compel Heisig to recognize and deal with Union as such bargaining agent, upon matters pertaining to the mutual business of Union's members and Heisig. We are satisfied that Heisig had no desire to reopen negotiations with Union, and that regardless of how Cascio may have conducted his negotiations with Price, an actual, bona fide labor dispute exists between Union and Heisig, in which Union's object is the object stated. We note that plaintiffs, in effect, have plead that a labor dispute existed between Union and Heisig.

According to such proof as we find in the record the strike was called and the pickets were established at the depot in accordance with Union's rules.

IX. The pickets, as has been stated, took station at plaintiffs' depot on Thursday, October 30th, and the evidence shows only what occurred from that time down to the time the hearing began on November 6th, of plaintiffs' prayer for a temporary injunction. However, as stated, the parties submitted the merits of their respective contentions upon this proof.

It appears that Heisig's drivers, helpers and warehouseman actually struck against Heisig, that is, ceased to work for Heisig as a consequence of the matters related above; and since the pickets were taken from these employees (at least in the great majority of instances) the strike must have become effective before or about the time the pickets were emplaced at the depot.

It also appears that Heisig's trucks were absent from plaintiffs' depot for a short time, perhaps 24 hours, after the pickets appeared at the depot. Then Heisig resumed performance of its contract with plaintiffs and continued to do so down to the time of the temporary injunction hearing. However, this renewed performance was limited and was insufficient to move plaintiffs' freight either into or out of

the depot; Heisig was unable to operate as many trucks as it had operated prior to the strike. As one consequence, there had been a steady and continuous accumulation of freight at the depot which plaintiffs could not deliver to their Beaumont consignees (until Heisig's reduced facilities finally got around to moving it) and there was proof from plaintiffs that they feared it would be necessary for an embargo to be declared, by themselves or by the Interstate Commerce Commission, upon the movement of freight into Beaumont. The witnesses apparently had in mind only L.C.L. freight, since the pickets had not affected the Railway's carload lot shipments.

Actually, the necessity of an embargo depended solely upon Heisig continuing to be plaintiffs' *exclusive* Beaumont pick-up and delivery contractor. For the accumulation of freight resulted from Heisig's inability to adequately perform its contract with plaintiffs. This might have entitled plaintiffs to terminate the contract if Heisig had refused to allow plaintiffs to supplement Heisig's services in some way; but plaintiffs had elected to keep their contract with Heisig in force and to seek relief by injunction rather than by making some kind of an adjustment with Heisig or with Union.

■ It also seems to us that Heisig's reduced facilities, Heisig's inability to fully perform its contract, the resulting accumulation of freight at the depot, and the possibility of an embargo were at least partly consequences of Union's *strike* against Heisig; we have not been able to perceive why plaintiffs should be entitled to any relief in this suit by reason of consequences of the strike.

The presence of the pickets had not affected Railway's rail movements. The pickets' stations did not cross the tracks, and all goods shipped by rail could freely enter upon the tracks at the depot. Nor did these picket stations cross the ways approaching these tracks on the north and on the west, and the presence of the pickets did not interfere with the removal of freight from cars upon these tracks. Thus car-load lot shipments could be freely removed.

However, the presence of the pickets at plaintiffs' depot had caused plaintiffs substantial damage and would continue to injure plaintiffs in the following respects for the reasons to be stated: (1) Transport's carriage of freight into and out of the depot had been completely stopped because Transport's truck drivers had refused to cross the picket lines at the depot. These drivers had the right, under their collective bargaining contract with Transport, to refuse to cross this line, and they availed themselves of this privilege. The loss to plaintiffs of Transport's facilities meant the loss of much business, and thus, the loss of revenue, because it unduly delayed the transportation of L. C. L. freight shipments between Houston and Beaumont (originating in those two cities), and this traffic was heavy and lucrative. As a substitute Railway had to provide extra cars, and this meant a substantial increase in the cost of transporting this class of freight. Despite the strike Transport continued to operate trucks through Beaumont to Orange and the inability to use these vehicles to carry freight into and out of Beaumont seems to have added to the expense which the pickets caused Transport; (2) some customers of plaintiffs did not want to become involved in the labor dispute, and had given their business to plaintiffs' competitors. It seems that truck drivers employed by persons in Beaumont had, at least to some extent, refused to cross the picket lines at the depot.

How much of plaintiffs' damages, actual and prospective, resulted from the presence of the pickets at the depot and how much of those damages resulted from the strike against Heisig cannot be accurately determined. It is apparent from the testimony that plaintiffs have confused the two kinds of damages. Plaintiffs, of course, had no right to complain because of the strike against Heisig. However, it is well enough proved that the presence of the pickets at the depot did result in substantial damage to plaintiffs, and this phase of the testimony need not be further discussed.

Heisig's inability to operate as many trucks as before the strike had another serious consequence to plaintiffs, namely, the inability to pick up local freight which

Beaumont consignors desired to show elsewhere, and this matter had resulted in a loss of business to plaintiffs.

X. There is evidence that at least one of Union's motives in establishing the pickets at plaintiffs' depot was to coerce Heisig, through plaintiffs, by exerting against plaintiffs the pressure which would, and in fact did result from the injury done to plaintiffs' business by the mere presence of these pickets at their depot; and although there is evidence to the contrary the trial court has, in effect, found this issue in plaintiffs' favor—if the matter be thought material. The evidence tending to show the existence of such a motive is as follows:

Frank L. Evans, General Agent for Missouri Pacific Lines, testified: "Q. Along the latter part of October, Mr. Evans, did you receive a call from one Lee Cascio in connection with a labor dispute between employees of Heisig Transfer Company and that Labor Union? A. Yes sir, I did.

"Q. What date was that? A. That was October 29, 1947. (This was the day after the strike was authorized and the day before the pickets were established at the depot).

"Q. What did Mr. Cascio tell you, Mr. Evans? A. He told me he was a representative of the Teamsters Union and that he had been dealing with Johnny Price of the Heisig Storage Company with relation to their contract and that Johnny would not cooperate with him, and he told me that he was putting the railroad on notice of what was being done and he expected us to talk to him with the view of having him cooperate in that respect.

"Q. What did you tell Mr. Cascio? A. I told him that was not under my jurisdiction.

"Q. Did you refer him to any other person in connection with it? A. Yes sir, and on his request as to whose jurisdiction it did come under, I referred him to Mr. Ralph Johnson of DeQuincey."

There is no evidence that Cascio had any other conversation with Johnson other than that of Friday morning, to which we now refer.

On Friday morning, October 31, 1947 (the day after the pickets took station at the depot), Johnson, Beckley and one of plaintiffs' present counsel went to Cascio, who was sitting in his automobile on Trinity Street near Union's picket station there, and had a conversation with Cascio concerning removal of the pickets from the depot.

Johnson testified, in effect, that plaintiffs' counsel inquired of Cascio whether the pickets would be removed if plaintiffs gave Cascio a letter stating that Heisig would remain away from the depot (Heisig's trucks had then been absent from the depot about 22 hours), and would not return except upon 24 hours' notice to Cascio of Heisig's intention to resume service at the depot.

Johnson testified as follows concerning the reason for making this inquiry of Cascio:

"Q. What was the purpose of your approaching Mr. Cascio? A. The purpose of approaching Mr. Cascio was that the pickets —or the Heisig Storage had been away from our station with all of their equipment since, I was told, Thursday noon. They had not been around and this was approximately 10:00 A.M. Friday and the pickets were still there. The Heisig Storage was in doubt as to whether they wanted to continue their handling of our merchandise, and we were trying to find out why or how and what it would take to get the pickets down since they were still there with the Heisig Storage having been moved out practically twenty-four hours.

"Q. All right, now then, did you at that time explain to Mr. Cascio about the removal of Heisig Storage from the place? A. No, he was there and could see it.

"Q. Well, you understood that the employees of Heisig Storage went out on strike, did you not? A. That's what I heard.

"Q. You knew that at the time? A. That's what I heard.

"Q. You knew it was reasonable to suppose on Mr. Cascio's part that the equipment was not to be seen because there was nobody there to operate it on the first day? A. I didn't know anything about that. I knew the equipment was not there but we still had the pickets.

"Q. Did you make any offer at that time or was it your intention to make an offer concerning the removal of the pickets? A. We might have done that if we had gotten the right kind of answer from Mr. Cascio.

"Q. In other words, with Heisig's equipment gone from there and not operating at that place, you felt there was no excuse for the picket line to be there, is that correct? A. That's right.

"Q. And under those circumstances if the picket lines had been removed would that have been a satisfactory conclusion of the matter so far as you were concerned? A. It could have been, if it had been satisfactory with my superiors."

Johnson testified that Cascio made the following answer to the inquiry addressed to him: "A. He told us all he wanted from the Heisig Storage & Transfer Company was a signed contract, but if the Missouri Pacific would give him a letter that our contract with the Heisig Storage & Transfer Company had been terminated and assure him that anybody that we contract to pick up and deliver with must sign a fair contract; I told him that we wasn't going to give him any such letter as that as we were not doing his organizing for him."

Beckley testified:

"Q. What did Mr. Cascio tell us his demands were as a condition precedent to moving of those pickets? A. He stated that the only letter that he would be interested in from the railroad company was a letter to the effect that Heisig Storage & Transfer Company's contract was terminated, that any contract that the railroad might negotiate would be fair.

"Q. Was it your understanding by that —A. To his union.

"Q. That the contract would be affiliated with his union? A. Be affiliated with his union.

"Q. Was he talking about just the Heisig contract or any subsequent contractor you might contract with? A. He didn't alaborate on that. He just stated that. I took it for granted that any contract we might negotiate with anyone would have to be fair to his organization before it was acceptable or permitted to work."

Cascio denied that he made the statement attributed to him by these witnesses. His version of the conversation was as follows:

"* * * Q. And that conversation had to do with the proposition of the withdrawal of the pickets, did it not, among other things? A. I believe so.

"Q. And did I not at that time, Mr. Cascio, say that the Beaumont, Sour Lake & Western Railway Company and Missouri Pacific Freight Transport Company would agree that no property or personnel of the Heisig Company would be allowed on the premises until you were given further notice if you would withdraw the pickets? A. That I don't recall. * * *

"Q. At that time, Mr. Cascio, did you or did you not make a statement in which you demanded as a condition precedent to the removal of the pickets that the Trustee— Missouri Pacific, we will put it generally, the Trustee and the trucking company terminate, I believe is the word you used, their contract with Heisig? A. Not that I recall.

"Q. Well, you tell the Court that you did not make some such statement or similar statement? A. If I recall right, Mr. Counsellor, my reply to your suggestion, or whatever it was, I don't even recall exactly what the conversation was in full, but to the best of my knowledge I believe I did reply that if the Heisig Transportation Company had no further operation on the Missouri Pacific—on or around Missouri Pacific that we would be more than glad to put the picket lines down, but that we would continue to picket Heisig Transfer & Storage at their warehouse.

"Q. Well, you deny, Mr. Cascio, that you said that you wouldn't remove those pickets until the railroad company terminated its contract with Heisig? A. Yes, sir.

"Q. You deny that? A. Yes sir.

"Q. Do you recall that I was there and Mr. Johnson was there and Mr. Beckley was there? A. I recall there were three there, however, the third party I do not recall."

"Q. Mr. Cascio did you not state that the pickets would not be removed until the railroad company signed a contract with the draymen, who had, as you used the term, had a fair contract with your Union? A. The exact wording, Mr. Counsellor, I don't recall. I believe the fact was brought out that we would prefer that the railroad company would hire a fair contractor in order to eliminate any further disturbance.

"Q. Didn't you make that a condition precedent to removing the pickets that you were going to picket as long as the company had a contract with Heisig, and going to keep on picketing until they signed a contract with some contractor who did have a contract with your Union? A. No, sir.

"Q. But you did intimate that the pickets would be resumed if some other contractor were contracted with by the company that did not have a contract with your Union, didn't you? A. I believe, Mr. Counsellor, we didn't have any dispute between Missouri Pacific at all.

"Q. No labor dispute exists between your Union and Missouri Pacific, does it? A. Not that I know."

In addition to the testimony of Evans, Johnson and Beckley just quoted, the trial court was authorized to find that when the pickets took station at the depot Cascio knew that Transport's drivers who belonged to unions affiliated with defendant union had a contract right to refuse to cross the depot picket lines, and that Cascio knew when the Friday conversation occurred that Heisig was not then carrying freight into or out of the depot, and that when the hearing was held on November 6th and 7th Cascio knew that, except in the one instance to which he did refer, Transport's drivers had refused to cross the depot picket lines and that drivers for some other persons were refusing to do so. Under all the circumstances, although Cascio denied it, the trial court was authorized to find, and under the judgment appealed from, we must assume that the trial court did find, that Union, through Cascio, originally intended, through the presence of the pickets at the depot, to bring about the sort of injury to plaintiffs' business which Johnson and Beckley testified to, and that this was a means adopted by Union, through Cascio, to coerce plaintiffs into coercing Heisig to make the desired agreement with the Union.

However, the trial court was not authorized to find that any unlawful combination or conspiracy had been entered into by Union in order to accomplish this end. The only combination shown by the proof was the Union itself. There is no evidence that Cascio confederated with or solicited aid from other persons; and all he did, and all Union did through him as regards plaintiffs was to set out the picket lines at the depot. So far as the record shows, Cascio's theory of action against Heisig through plaintiffs was founded upon no more than his knowledge of how the picket line might be expected to work, and other than his knowledge of the contract rights of Transport's drivers, such information as this record shows him to have had consists of facts now commonly known among the public, especially in industrialized communities.

Criticism of the use of pickets under such circumstances is inconsistent with the existence of a right to picket and with decisions cited below, based upon the common law of private competition and upon the 14th amendment to the Federal Constitution, holding that the injury from lawful picketing is damnum absque injuria.

Furthermore, the trial court was not authorized to find that this motive was Union's sole motive in placing pickets at the depot. Union never expressly declared the existence of any dispute with plaintiffs (and Cascio denied that any existed). The pickets' placards referred only to Heisig employees. The depot was unquestionably (and had been for years) a Heisig place of business and a place of work of Heisig employees. Ostensibly, at least, Union's depot pickets were picketing Heisig and they could not very well do this without at the same time affecting plaintiffs. The existence of this other motive, namely, the motive of picketing Heisig, was certainly fixed of record when plaintiffs' prayer for temporary injunction came on for hearing on November 6, 1947, 6 days after the Friday conversation referred to above. In their original answer defend-

ant made the following plea: "Defendants do not assert any intention of maintaining pickets at or near the premises at 540 Neches Street except insofar as there occurs at said location, business operations by their employer, Heisig Transfer & Storage Company and hereby in open court judicially acknowledge and offer to withdraw the said pickets instantly upon the withdrawal by the said Heisig Transfer & Storage Company from the said location." This plea was reiterated in paragraph 19 of defendant's amended answer, filed on January 2, 1948. The same admission was made upon the temporary injunction hearing, as the following quotation from the record shows (Cascio's testimony):

"A. I believe, Mr. Counsellor, we didn't have any dispute between Missouri Pacific at all.

"Q. No labor dispute exists between your Union and Missouri Pacific, does it. A. Not that I know. * * *

"A. Not necessarily, sir. We are merely saying this, that that is more or less the headquarters of the Heisig Company. It is the headquarters of their operations so far as movement of freight on the dock and off the dock, and we feel within our legal rights we are advertising the fact that Heisig employees are on strike.

"Q. You are demanding that we terminate our relations with Heisig as a condition precedent to removing the pickets?

"By Mr. Dixie: (Union's Counsel) I offer to correct that statement. I have not demanded the termination of the contract. I merely stated that if Heisig is not there, there is no occasion for us to make picket. Whether they terminate by mutual agreement or make other agreements, that's up to them. We do not dictate that. We just say that we are not going to be there if Heisig is not there. Of course, we say that because we are trying to accept their own offer.

"Q. Mr. Cascio, it is your intention and the Union's intention to maintain those two picket lines there forever, if necessary, unless Heisig Transfer & Storage Company signs a contract with your Union as long as Heisig comes in there and moves freight? A. As long as Heisig operates and stays

at the same location and. the places they are operating from, that's our intention."

This record shows, of course, that according to plaintiffs' version of the Friday conversation the parties have reversed their position regarding the withdrawal of the depot pickets. For on the temporary injunction hearing, Union was willing to do what plaintiffs' agents apparently wanted them to do a week earlier on Friday, October 31, but no longer wished them to do at the time of the hearing. However, this is of no significance except as it shows plaintiffs' eventual determination to maintain their contract with Heisig.

It was plaintiffs' theory on the temporary injunction hearing that Union was attempting to force plaintiffs to abrogate their contract with Heisig; and if there is any evidence to that effect it has been quoted above.

This evidence does not show that Union entertained such motive, in the sense of wishing to displace Heisig with some other agency. Nor does it show that Union bore any ill will toward Heisig. It shows, instead (according to plaintiffs' version of the Friday conversation), that Union only wanted plaintiffs to make a contract with some agency which would deal with Union, employ Union members, etc. The record as a whole does not indicate that Heisig would have been unacceptable to Union if Heisig had consented to make an agreement with Union. Union's course of conduct proves exactly the contrary; Union was attempting to make Heisig a Union employer, not to punish Heisig or to put Heisig out of business. The question raised by the proof concerning Union's original motive is whether Union had a legal right to coerce Heisig through plaintiffs by means of the depot pickets, not whether Union could picket plaintiffs to compel plaintiffs to abrogate Heisig's contract.

These conclusions are inconsistent with some findings made in the trial court's decree, and such findings, to the extent of the inconsistency, are set aside.

XI. Defendants seem to have had some theory in mind that plaintiffs were participating in the labor dispute between Heisig and Union, but there is no evidence of

any such participation either directly or indirectly, except as plaintiffs' insistence upon maintaining their contract with Heisig and their insistence upon Heisig continuing to serve them as their Beaumont pick-up and delivery agency under the contract aforesaid amounts to a participation in the dispute between Heisig and Union. This conduct did not amount to the sort of participation defendants have in mind. That plaintiffs did such things shows only that they wished to assert their own version of their rights; and that plaintiffs brought this suit proves no more than their adoption of a particular method to protect their contract rights with Heisig.

XII. Union has not been certified by the National Labor Relations Board as collective bargaining agent for Heisig's striking employees; and the proof also does not show that Union had complied with some provisions of the Taft-Hartley Act; however, neither party has claimed any rights under Federal law.

### Conclusions of Law

Defendants have filed 10 Points of Error for reversal.

Under Point 8, defendants say that the following finding in the trial court's judgment is not supported by the evidence: "The court finds that Heisig Transfer & Storage Company has never maintained an *office* or *place of business* at or near the premises of the plaintiffs known as the Missouri Pacific Freight Depot at 540 Neches Street in Beaumont, Texas, at any time material hereto."

Point 8 is sustained as regards the finding that Heisig had never maintained a *place of business* at the depot; but it is overruled as regards the finding that Heisig had not maintained an *office* there. This matter has been discussed in Article VII of our Conclusions of Fact.

Points 1, 2 & 3 read as follows: (Pt. 1) "The injunction against picketing at the scene of the work and the employment is a violation of Article 5154 (Defendants evidently refer to Art. 5152) Revised Civil Statutes of Texas, 1925, which recognizes and establishes the right to picket in a labor dispute." (Pt. 2) "Since the railroad and its affiliated truck line are in intimate contractual and business relationship with Heisig, and they all constitute a single business operation by ordinary and accepted business standards and practices, the picketing of Heisig at the depot does not constitute secondary picketing nor secondary boycott as other constituent parts of the whole. The injunction is therefore erroneous." (Pt. 3) "The injunction violates the First and Fourteenth Amendments of the United States Constitution, because it enjoins employees and their union from peaceful picketing (1) at the scene of the job (2) for union recognition, and (3) in support of union standards existing in Beaumont, Texas, in highly competitive business—which injunction is granted at the suit of plaintiffs in such intimate juxtaposition to the primary labor dispute that they profit from the injunction."

Points 1, 2 & 3 are sustained in part, to the extent and upon the grounds hereinafter set out:

■ (1) *The legality of the object for which the strike was called against Heisig, and of the means employed against Heisig to accomplish that object:*

The identification of the object Union had in mind in calling the strike against Heisig is a question of fact; and in Article X of our Conclusions of Fact we have found that this object was to compel Heisig to recognize, that is, to deal with Union as the collective bargaining agent of Heisig's employees who had joined the Union and had authorized the strike to be called.

Art. 5152, R.S.1925, which brought forward Section 1 of Chapter 153, Acts of the 26th Legislature, Gen'l Laws 1899, p. 262, authorizes workmen "to associate themselves together and form trades unions and other organizations for the purpose of *protecting themselves in their personal work, personal labor, and personal service in their respective pursuits and employments.*" Two years prior to the Act of 1899, the 25th Legislature had used language similar to that quoted in authorizing the formation of corporations "for the organization of laborers, workingmen, wage earners and farmers to *protect themselves*

*in their various* pursuits." Chapter 130, Sec. 48 of amended Art. 642, Gen'l Laws 1897, p. 188. This statute has been brought forward in Sec. 83 of Art. 1302. Another Statute Art. 5153, which brought forward Section 2 of the Act of 1899, authorizes members of trades unions and other organizations or associations, by peaceable and lawful means, not involving trespass upon another's premises, "to induce or attempt to induce * * * any person to accept any particular employment or to enter or refuse to enter any pursuit or quit or relinquish any particular employment or pursuit in which such person may then be engaged."

In so far as we have been able to determine, these statutes are the only Texas legislative enactments which might be thought to authorize the strike against Heisig and the picketing incidental thereto. It is to be noted that the *purposes* for which trades unions and workmen's associations may be formed have not been specified except in the most general way, namely, for the *purpose* of *protecting members in their personal work, personal labor and personal service in their respective pursuits and employments.* The corporation purpose expressed in Sec. 83 of Art. 1302 is stated in even more general terms. Further, it is to be noted that the means whereby trades unions and workmen's associations shall accomplish their purposes have not been fully specified; the legislature other than granting the privileges referred to in Art. 5153 has only attempted to indicate some means which shall not be used. Thus in Art. 5153 it is provided that means employed to induce one to quit or to enter a particular employment shall be *peaceable* and *lawful* and shall not involve *trespass upon the premises of another.* For what purposes and by what methods and agencies the privilege granted in Art. 5153 shall be exercised, the Legislature has not said, except as the general terms used in the other statutes cited may affect those matters. There are other restrictions in other statutes, which need not be listed. Therefore, to determine the validity of the object of Union's strike against Heisig we must go to the common law of labor disputes and we must do the same to determine the legality

of the means Union has adopted to accomplish that object, except as these matters may be governed by constitutional provisions, or by implications from the statutes quoted.

The Commission of Appeals, in Sheehan v. Levy, 238 S.W. 900, 902, referred to Articles 5152 and 5153 (then Arts. 5244 and 5245, R.S.1911) as authorizing trades unions and workmen's associations to promote *the general welfare of their members,* specifying some of the objects falling within the scope of that general welfare. The Commission said: "Arts. 5244 and 5245 * * * authorize organizations such as labor unions, and give them the right, within certain bounds, to act together to promote their general welfare. Not only does the law of Texas so permit, but other authorities hold that laboring people may 'organize for the purpose of promoting their common welfare, elevating their standard of skill, advancing and maintaining their wages, fixing the hours of labor and the rate of wages paid, obtaining employment for their members.' See Cyc. vol. 24, p. 819."

The Commission further held, in effect, that to accomplish a lawful purpose, labor unions might strike against an employer, not as an incident of the statutes referred to above but under a rule of the common law now to be referred to. The Commission realized that injury resulted to the employer from the strike, an intentional act of the striking employees, but they thought this damnum absque injuria because it was reasonably incidental to the employees' efforts to benefit themselves, a lawful object. A common-law rule applicable generally to economic competition among individuals, by means of combinations of individuals, was applied to the labor union's efforts to better the condition of its members. Said the Commission in stating this rule: "In * * * Griffin v. [Palatine] Insurance Co., [Tex.Com.App.], 235 S.W. 202, the Commission * * * inserted in its opinion the notation made by our Supreme Court in granting the writ of error therein. We quote from said notation as follows: 'A man may lawfully refuse to have business relations with another for any reason—on account of whim, caprice, prej-

udice, or ill will. He may lawfully induce others to refrain from having business relations with such third person, though it injuriously affects such person, provided his action be to serve some legitimate interest of his own."

The Commission held, on the facts, that a trades union, members of which were Sheehan's employees, might strike against Sheehan to compel Sheehan to join an association of employers with whom the union had a contract giving the union certain benefits which they had not received from Sheehan but which they would receive upon Sheehan's becoming a member of the association.

Subsequently, in Hudson v. St. Louis, Southwestern Ry. Co., Tex.Com.App., 293 S.W. 811, 813, the Commission held, in effect, that the picketing by striking employees of their employer at the place which the proof showed was their place of work was lawful. The action was in tort, by parents against their son's employer, to recover damages for the death of their son who was one of the striking employees and who was killed by an employee of the Railway, a special ranger named Pearce, while he was on picket duty. Said the Commission: "It is matter of judicial notice in the courts that in cases of serious strikes by employees of railway companies there does arise a species of *industrial warfare* in which the principal weapon upon the one hand is the embarrassment of lack of employment even at times to the point of want and hunger, and, on other, that universal aid to the strike—the picket. The weapons are not always of equal potency, but *the respective methods are within themselves at least not unlawful.* The fact remains, however, in all such cases, and in the present case, the success of the picket line is a telling factor in this industrial battle. It cannot be doubted, therefore, in the very nature of things, that a part of the duties— yea, much of them—of these ranger guards had to do with this picket line. Indeed, there is much evidence tending to show this to be the case. *The maintaining of such picket line and performing services thereon being altogether lawful, there was nothing calling for the exercise by Pearce of any official act toward young Hudson.*

He had violated no law and was not threatening any violation. His services on picket duty for the strikers *could only serve as an embarrassment* to the company and *contribute in some measure to its difficulties* in efficiently carrying on its business." The Commission referred to no basis of the right to picket, and seem to have regarded the use of the picket line in connection with the strike as a reasonable and, indeed, normal method of making the strike effective. There is nothing in the opinion which indicates that the right to picket the employer was traceable, to, or was limited by the statutes referred to above; and the opinion clearly shows that the injury caused the employer by the picket line was thought to be damnum absque injuria for the same reason that injury caused the employer by the strike afforded him no cause of action.

In American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855, the U. S. Supreme Court held that a labor union had the right to picket an employer who did not employ any member of the union, to compel this man to employ union workers, and that the union members' right of free speech was involved in this picketing. We note that in the earlier case of Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, at page 1103 et seq., the Court used language regarding injury from the proper exercise of this right which is equivalent to the holdings of the Commission in the opinions just cited.

Since these decisions the Supreme Court of Texas, following the decisions of the U. S. Supreme Court just cited and other decisions of that Court have held in Ex parte Henry, Tex.Sup., 215 S.W.2d 588, 589, that the right of free speech extends to and includes peaceful picketing which involves an expression of facts concerning a labor dispute. We note that the strike referred to in this opinion was called by certain employees "to *gain recognition of their union* and a contract for fewer work hours and premium pay for overtime."

Under these decisions it must be concluded that the strike called against Heisig was called for an object lawful under Texas law. This court, in effect, so held in Fair, Inc., v. Retail Clerks, Tex.Civ.App., 157 S. W.2d 716, and there is similar authority in:

Henke & Pillot v. Amalgamated Meat Cutter, Tex.Civ.App., 109 S.W.2d 1083, by the Galveston Court. This view has been adopted by the Restatement, Torts, Sec. 785, and see: Opera on Tour, Inc., v. Weber, 285 N.Y. 348, 34 N.E.2d 349, page 352, 136 A.L.R. 267, L.Hn. 2, 37. We note that it is a lawful object of union action under the Labor Management Relations Act, 1947. See Title I, Sec. 101, "Sec. 2(9), 29 U.S.C.A. § 152(9)," defining "labor dispute". The law could not well be otherwise if the statutory rights of workmen in Texas to form associations and corporations for the protection of their interests is to be of any real worth. For the accomplishment of every other object of a labor union depends in the first instance upon the employer's willingness to recognize and to deal with the union as the collective bargaining agent of its members; and if the union can not compel the employer to do this they can not compel him to grant them any other privilege or right. The union is merely the employees in combination; and a refusal to recognize and deal with the union as collective bargaining agent of its members is but to refuse to deal with the employees associated together.

There is certainly nothing in the statutes cited above which is inconsistent with these views, and we construe Section (h) of Article 5154f, § 2(h), as including, and authorizing, by necessary implication the object for which the strike was called against Heisig. It is by reason of this statute that we have extended our remarks on this point.

These conclusions establish Union's right under Texas law to seek to obtain the object for which the strike was called against Heisig, to attempt to accomplish that object by calling the strike against Heisig, and by picketing Heisig at Heisig's warehouse and office at 955 Pearl Street in Beaumont, and also show that Heisig has no ground for relief because of injury resulting to Heisig from this strike and this picketing. Concerning the right to picket the scene of the labor dispute, also see the decisions of the U. S. Supreme Court cited below, and the decision of that Court in Schneider v. Town of Irvington, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155.

■ (2) Union says, however, that plaintiffs' freight depot is also a scene of the labor dispute because it is a place of business of Heisig and a place where Heisig's striking employees performed their work, and thus, they say, they had the right to conduct such picketing at this depot as they were doing. We have found this depot to be the place of business and place of work which Union says it is. See Article VII of our Conclusions of Fact. With this argument is to be considered Union's declaration of intention to conduct this picketing only so long as the depot remained such a place of business and work. We agree with this argument, for the depot is one of the physical scenes of the labor dispute with Heisig, and any harm to plaintiffs from the exercise of this right would afford plaintiffs no ground of relief because this harm is an incident of a legal right. If plaintiffs have so entangled themselves with a party to a labor dispute that this party can not be picketed without plaintiffs themselves, in effect, being picketed at the same time, then it ought to be said that plaintiffs made their arrangements with Heisig, and entangled themselves with Heisig, at the peril of seeing Heisig becoming involved in a labor dispute.

We have concluded, however, that plaintiffs were parties to the labor dispute between Heisig and Union, at least as regards the question, whether the pickets could be maintained at the depot and thus the argument must certainly be good as applied to the facts of this case; for if plaintiffs are parties to the dispute and if the depot is such a place of business and work as we have found it to be, then the depot is the scene of Union's labor dispute with plaintiffs. It seems to be, in fact, the only place, the only physical scene, at which plaintiffs can be picketed by Union; it is at least a proper place to picket plaintiffs if Union has the right to picket plaintiffs. With this phase of the argument may be considered Union's original motive in establishing the picket line at the depot, and we have discussed this matter in part 5 of this opinion, infra.

(3) *Plaintiffs were parties to the labor dispute between Heisig and Union by vir-*

tue of their economic relation to Heisig and Union, and we have some inclination to think that they were so by virtue of their legal relation to Heisig.

Heisig is denominated an *independent contractor* in the contract with plaintiffs quoted above, but Heisig was, and functioned as, the agent of plaintiffs. Thus under the contract with plaintiffs, Heisig's duties consisted only of the performance of plaintiffs' contracts of affreightment at the direction of plaintiffs. The proof goes further and shows that Heisig often initiated these contracts, with plaintiffs' consent. Heisig's connection with plaintiffs was publicly known and many Beaumont shippers notified Heisig, in the first instance, that they had freight to be shipped over plaintiffs' lines, and Heisig accepted this freight—for shipment over plaintiffs' lines—took possession of it and carried it to plaintiffs' depot, whence plaintiffs carried it out of Beaumont. All this Heisig did in plaintiffs' behalf and, in effect, in plaintiffs' name; and this course of conduct was known to plaintiffs and plaintiffs approved it. Heisig had some independence in determining how freight which had been delivered to it was to be moved, and Heisig had been given control over the hiring of its employees, their wages and hours of work and other matters referred to in Article VII of our Conclusions of Fact; but as regards the nature of its duties and its performance of those duties, Heisig occupied the status of agent, one for whose conduct within the scope of his agency plaintiffs are fully liable in damages. See Dublin v. Taylor B. & H. Ry. Co., 92 Tex. 535, page 538, 50 S.W. 120, page 121: "It is not necessary for this court to determine whether Burkitt & Murphy were independent contractors under their contract with the railroad company as to other parts of the work; for, by the contract, the railroad company reserved the right to designate the points at which crossings should be put in on private and public roads, the contractors having no right to even close up a road until it had been passed upon by the engineer of the railroad company. While it is true that a reservation of control over that part of the work would not alone make the railroad company liable, as master, for the whole work, yet, in respect to crossings at intersections of all roads, it acted as master in exercising the reserved powers, and will be held responsible for the consequences. Wood, [Law of] Mast. & S., § 315, p. 616; 2 Wood Ry. Law, 1017; Kelly v. Howell, 41 Ohio St. 438; Allen v. Hayward, 53 E.C.L. 974." And see: Gilbert Mfg. Co. v. Connellee, Tex.Com.App., 265 S.W. 375.

We agree with plaintiffs, however, that Heisig, and not the plaintiffs, was the employer of the striking employees under the common law of Master & Servant, and in such Texas decisions as we have seen, the right to picket has not been extended beyond a picketing of the common-law employer who is involved in the labor dispute; the right to picket one with whom that employer dealt in conducting his business has been denied. See Culinary Workers' Union v. Fuller, Tex.Civ.App., 105 S.W.2d 295, by this court; and International Association of Machinists v. Federated Ass'n of Accessory Workers, Tex. Civ.App., 109 S.W.2d 301, writ granted by subsequently dismissed as being moot: 133 Tex. 624, 130 S.W.2d 282; Carpenters & Joiners Union of America v. Ritter's Cafe, Tex.Civ.App., 149 S.W.2d 694; Borden Co. v. Teamsters' Union, Tex.Civ.App., 152 S.W.2d 828; and International Union of Operating Engineers v. Cox, Tex.Civ.App., 212 S.W.2d 1000, all by the Galveston Court; and also see: Turner v. Zanes, Tex.Civ.App., 206 S.W.2d 144, by the Dallas Court.

However, none of these decisions shows so intimate and direct a relation between the picketed third party and the picketing strikers as appears from the record before us; and thus none of these decisions is in point on the facts. Here, the strikers, although not employees of plaintiffs (according to the common law of Master & Servant), are the employees of plaintiffs' agent, and with their employer are engaged in performing plaintiffs' contracts of affreightment. They participate directly in the conduct of plaintiffs' business; they do plaintiffs' work. For their conduct plaintiffs may be responsible in

damages. Too, there is the same kind of economic competition between plaintiffs and the striking employees for a larger share of the freight rate that exists between plaintiffs and their own employees. The only basis for saying that plaintiffs are neutrals, that plaintiffs are not parties to the dispute these strikers have with Heisig, is the independence which plaintiffs have given Heisig in selecting employees and controlling details of the work of these strikers. This the plaintiffs obviously did for their own convenience and profit; and to say that this is enough to insulate plaintiffs from the dispute between the strikers and Heisig, and thus, to make a distinction between these strikers and plaintiffs' own common-law employees, whereby the latter, but not these strikers, could picket plaintiffs, is to adopt a purely mechanical solution of the problem which works in an artificial way and which ignores the realities of the case. We note that the Labor Management Relations Act, 1947, defines *employer* as including "any person acting as an agent of an *employer*, directly or indirectly". See Title I, Sec. 101, "Sec. 2(2)" of that statute.

We are therefore inclined to hold that the distinction between primary and secondary picketing which is, in effect, made in the decisions cited above and which would throw a case of picketing into one classification or the other according to whether the common-law employer or one with whom he conducted his business was the person picketed, ought not to be applied to the facts of this case; and are inclined to hold further that plaintiffs' relinquishment to Heisig of independence in employing workers and in controlling their work was done at the peril of having those workers become involved in a labor dispute with Heisig and of being put to the necessity by reason of pressure upon them from the strikers, of themselves exerting pressure upon Heisig if that proved to be necessary to resolve that dispute. We think this a reasonable incident of the system of operation which plaintiffs elected to adopt. For the same reasons we are inclined to think that the Texas antitrust laws ought not to be applied to the facts of this case—if it be thought that these laws would otherwise be applicable.

However, in determining the parties to a labor dispute who may be picketed by a labor union, we are now controlled by certain decisions of the Supreme Court of the United States, which have rejected the distinction between primary and secondary picketing resulting from the Texas decisions cited above and which, in a field of law in which that Court has final jurisdiction, have in effect overruled those decisions upon the point now under consideration. The test adopted by the U. S. Supreme Court for identifying the parties to a labor dispute who may be picketed by a labor union is the economic relation of the parties.

There was weighty authority prior to these U. S. Supreme Court decisions, holding that the parties to a labor dispute who might be picketed by a labor union were to be determined by the economic relation of the parties, although it is not clear to us that the boundaries of this test coincide with that adopted by the U. S. Supreme Court. Thus in Goldfinger v. Feintuch, 276 N.Y. 281, 11 N.E.2d 910, 116 A.L.R. 477, decided in 1937, the Court of Appeals of New York held that the striking labor union could picket the employer/manufacturer's product in the hands of a retail merchant who had purchased the product for resale to the public. Said the Court, 11 N.E.2d at page 912: "Likewise it is illegal to picket the place of business of one who is not himself a party to an industrial dispute to persuade the public to withdraw its patronage *generally* from the business for the purpose of coercing the owner to take sides in a controversy in which he has no interest. * * * Within the limits of peaceful picketing, however, picketing may be carried on not only against the manufacturer but against *a non-union product* sold by one in unity of interest with the manufacturer who is in the same business for profit. Where a manufacturer pays less than union wages, both it and the retailers who sell its products are in a position to undersell competitors who pay the higher scale, and this may result in unfair reduction of the wages of union mem-

bers. Concededly the defendant union would be entitled to picket peacefully the plant of the manufacturer. Where the manufacturer disposes of the product through retailers in unity of interest with it, unless the union may follow the product to the place where it is sold and peacefully ask the public to refrain from purchasing it, the union would be deprived of a fair and proper means of bringing its plea to the attention of the public." Further, 11 N.E.2d at page 913, "We do not hold more than that, where a retailer is in unity of interest with the manufacturer, the union may follow the nonunion goods and seek by peaceful picketing to persuade the consuming public to refrain from purchasing the nonunion product, whether that is at the plant of the manufacturer or at the store of the retailer in the same line of business and in unity of interest with the manufacturer."

A similar test, subject to some qualifications not relevant here, has been adopted by the Restatement, Torts, Secs. 799 to 801, inclusive. The Goldfinger case was cited, and similar decisions were made by: (a) The California Supreme Court, in Fortenbury v. Superior Court, 16 Cal.2d 405, 106 P.2d 411. The picketing was broader here. See Teller's Labor Disputes, Sec. 123, P. 379; (b) The Pennsylvania Supreme Court, in Alliance Auto Service Co. v. Cohen, 341 Pa. 283, 19 A.2d 152, which also applies the right of free speech to picketing which involves an expression of facts about a labor dispute; (c) by the Court of Appeals of Louisiana, for the 2nd District, in Johnson v. Milk Wagon Drivers & Dairy Employees Union, La.App., 195 So. 791; (d) and by the New Jersey Chancery Court in Newark Ladder & Bracket Sales Co., Inc., v. Furniture Workers Union, 125 N.J.Eq. 99, 4 A.2d 49, and see: Consolidated Realty Co. v. Dyers, Finishers & Bleachers Federation, 137 N. J.Eq. 413, 45 A.2d 132.

We shall now refer to the decisions of the U. S. Supreme Court, which we deem to be controlling here.

In Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and in Carlson v. California, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104, decided on April 22, 1940, it was held that a *labor dispute* was a matter of public concern; that picketing was a proper means of publicizing the facts concerning this dispute; and that expressions of these facts by the picketers constituted an exercise of the right of free speech which was guaranteed against State action by the 14th Amendment to the Federal Constitution. The picket in the Carlson case walked back and forth in the vicinity of the place of work, carrying a placard which bore certain statements. Thornhill, acting as a picket before the employer's plant, requested a person not to go to work for employer. In Schneider v. Irvington, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155, in cause No. 18, the picket, held to be exercising the right of free speech, was standing in front of the employer's place of business distributing hand bills concerning a labor dispute with the employer.

The court in the Thornhill and Carlson cases did not define the *labor dispute* which could be publicized by picketing under the protection of the 14th Amendment; the matters to be decided were the constitutionality of an Alabama statute and a California county ordinance which prohibited all forms of picketing.

We note, in passing, because plaintiffs seem to argue to the contrary in their brief, that in Thornhill v. Alabama the court pointed out that the State, although having a certain power to set the limits of the private contests involved in labor disputes could not, under the guise of exercising that power, abridge the right of free speech. Said the Court, 310 U.S. 88, 60 S.Ct. 736, at page 745, 84 L.Ed. at page 1103: "It is true that the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants. * * * It does not follow that the State in dealing with the evils arising from industrial disputes may impair the effective exercise of the right to discuss freely industrial relations which are matters of

public concern. A contrary conclusion could be used to support abridgement of freedom of speech and of the press concerning almost every matter of importance to society." This holding would seem to be a truism if the 14th Amendment is to mean the same thing in all of the States. It has, of course, been consistently followed by the U. S. Supreme Court and has been reiterated in several of the cases cited hereinafter. It is of some materiality here under arguments made by plaintiffs.

In cases decided subsequently to the Thornhill and Carlson litigation the court undertakes to say how the parties to the *labor dispute* who might be picketed were to be determined. Thus in a case originating in the Federal courts, namely, Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63, decided on November 18, 1940, the court held that the case involved a labor dispute within the meaning of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq. That statute limited the powers of the Federal Courts to grant injunctive relief in cases "involving or growing out of a labor dispute". It applied between "persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein;" and it defined *labor dispute* as including "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

The holding is significant because in two other decisions, cited below, namely, the Meadowmoor and Wohl cases, the court undertook to determine, without regard to statutes, the identity of the parties to those disputes who might be picketed in the exercise of the right of free speech, and in so doing apparently arrived at about the same conclusion regarding these parties as they arrived at under the broad statutes quoted above.

The suit was for injunctive relief, to prohibit defendants' picketing certain retail shops selling plaintiffs' milk. The plaintiffs were: (a) a dairy farmers' milk cooperative; (b) two dairies; and (c) members of a C.I.O. local union. The cooperative sold milk to the dairies, which, in turn, sold it to the C.I.O. union members, referred to as "vendors". These "vendors" then sold the milk to retail merchants who bought for resale to the public. Defendants were members of a local union of milk wagon drivers, affiliated with A.F. of L., who were employed by other dairies to deliver milk which these dairies sold to retail merchants for resale to the public. The parties, if the retail merchants be included, represented in effect the Chicago milk industry. The issue between the parties to the suit was this: Defendants said that the system of milk distribution used by plaintiffs competed with and undersold the system in which they and their employers engaged; and that by virtue of employment practices followed in plaintiffs' system and the success of this system in competition with defendants' system, defendants' wages and conditions of employment were being lowered. To compel the abandonment of plaintiffs' system, the defendants picketed the shops of the retail merchants who purchased milk from the "vendors". The Court found that this case grew out of a *labor dispute* within the meaning of the Norris-LaGuardia Act, saying, 311 U.S. 91, 61 S.Ct. at page 126, 85 L.Ed. at page 68: "Whether rightly or wrongly, the defendant union believed that the 'vendor system' was a scheme or device utilized for the purpose of escaping the payment of union wages and the assumption of working conditions commensurate with those imposed under union standards. To say, as the Circuit Court of Appeals did, that the conflict here is not a good faith labor issue, and that therefore there is no 'labor dispute', is to ignore the statutory definition of the term; to say, further, that the conditioned abandonment of the vendor system, under the circumstances, was an issue unrelated to labor's efforts to improve working conditions, is to shut one's eyes to the everyday elements of industrial strife."

The parties to the *labor dispute* discussed in this Lake Valley case were nowhere connected as employer and employee; the

relation was the economic relation of parties engaged in the same trade, business and industry, and we think that the existence of precisely such a relation as the test for identifying parties to a labor dispute who may be picketed in the exercise of free speech must be implied from the decisions now to be discussed.

Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200, originated in the Illinois courts, and was an appeal by certiorari to the Supreme Court of that State. It was decided on February 10, 1941, about three months after decision of the Lake Valley case.

The suit grew out of the same industrial dispute as did the Lake Valley case. Meadowmoor had adopted the C.I.O. "vendor" system, and the A.F. of L. Union had begun to peacefully picket retail merchants purchasing Meadowmoor's milk. Much violence over a long period had attended the industrial dispute between the parties engaged in the two systems employed to sell and distribute milk in Chicago, and had attended Meadowmoor's part in the dispute. This violence had occurred before the peaceful picketing of Meadowmoor's retail outlets by the A.F. of L. union, but the Illinois courts enjoined this picketing and the U. S. Supreme Court affirmed the Illinois decree. In effect, the Court purported to follow a fact finding by the Illinois court, that because of this antecedent violence, the peaceful picketing had become an instrument of coercion by force and fear, rather than an instrument of persuasion; and that by virtue of their power to prevent future coercion of this sort the Illinois court had the power to enjoin picketing which was actually peaceful. The question before the court was whether the protection of free speech by the 14th amendment extended to peaceful picketing under the facts found by the Illinois court, but the Court's opinion shows plainly that the Illinois decree was affirmed only because of the State's power to prevent future coercion by force and fear, and also shows that had this coercion not been in the case the defendants would have been entitled to picket the retail shops

which purchased milk from Meadowmoor's "vendors". Said the court in the majority opinion, Milk Wagon Drivers Union v. Meadowmoor, 312 U.S. 287, 61 S.Ct. 552, at page 556, 85 L.Ed. 836, at page 842, 132 A.L.R. 1200: "We have already adverted to the generous scope that must be given to the guarantee of free speech. Especially is this attitude to be observed where, as in labor controversies, the feelings of even the most detached minds may become engaged and a show of violence may make still further demands on calm judgment. *It is therefore relevant to remind that the power to deny what otherwise would be lawful picketing derives from the power of the states to prevent future coercion.* Right to free speech in the future cannot be forfeited because of disassociated acts of past violence. Nor may a state enjoin peaceful picketing merely because it may provoke violence in others."

That this language was intended to apply to the facts of the case is clearly shown by the following, which immediately succeeds the quotation just made, 312 U.S. 287, 61 S.Ct. at page 556, 85 L.Ed. at page 842: "Inasmuch as the injunction was based on findings made *in 1937,* this decision is no bar to resort to the state court for a modification of the terms of the injunction should that court find that the passage of time has deprived the picketing of its *coercive influence.*" And by the following language which plainly supports the construction we have given the majority opinion, 312 U.S. 287, 61 S.Ct. at page 557, 85 L.Ed. at page 844: "The injunction which we sustain is 'permanent' only for the temporary period for which it may last. *It is justified only by the violence that induced it and only so long as it counteracts a continuing intimidation.* Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted."

We think it necessarily to be implied from this decision that the Court thought the economic relation between the parties to the industrial controversy within the milk industry centering in and around Chicago was sufficiently close to justify one of those parties, the A.F. of L. Union in picketing the retail outlets for the prod-

uct of another of those parties, Meadowmoor; and thus this relation, and not the relation of employer and employee is the test for determining who may be picketed (in the exercise of free speech) as an incident of a labor dispute.

In American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855, decided on Feb. 10, 1941, this holding was expressly made. The case also originated in the Illinois Courts. Swing did not employ union labor, and the union picketed him to compel him to employ such labor. None of Swing's employees were members of the union, and upon this ground the Illinois courts enjoined the picketing at the suit of Swing and his employees. The Supreme Court reversed the decree, and held, in effect, that the controversy between Union and Swing was a lawful labor dispute, that the ground upon which the Illinois Court acted had operated so as to abridge the union members' right under the 14th Amendment to publicize the facts of this labor dispute, to which they and Swing and his employees were parties, and thus was invalid. It was the economic relationship of union, Swing and Swing's employees, namely, the fact that they were all engaged in the same trade or business, which made them parties to the dispute. The Court stated the question in these terms, 312 U.S. 321, 61 S.Ct. at page 569, 85 L.Ed. at page 856: "* * * is the constitutional guarantee of freedom of discussion infringed by the common law policy of a state forbidding resort to peaceful persuasion through picketing merely because there is no immediate employer-employee dispute?" The Court then answered the question affirmatively in language which would seem to finally settle the point now under consideration. Said the Court:

"All that we have before us, then, is an instance of 'peaceful persuasion' disentangled from violence and free from 'picketing en masse or otherwise conducted' so as to occasion 'imminent and aggravated danger'. Thornhill v. Alabama * * *. We are asked to sustain a decree which for purposes of this case asserts as *the common law of a state* that there can be no 'peaceful picketing or peaceful persua-

sion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him."

"Such a ban of free communication is inconsistent with the guarantee of freedom of speech. That a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. *The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. * * * The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ.* Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in Thorhill's case."

According to this language, plaintiffs were assuredly parties to the labor dispute between Heisig and Union. The two decisions now to be cited confirm this conclusion and fix, if the decisions heretofore cited do not, the economic relation of the parties as the test for determining who are the parties to a labor dispute that may be picketed (in the exercise of free speech) by a striking labor union.

In Carpenters & Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143, decided on March 30, 1942, the Court affirmed a judgment of the Galveston Court of Civil Appeals which enjoined the union from picketing the cafe of Ritter.

250

Ritter's business was the operation of this cafe. He made a contract with Plaster whereby Plaster undertook to erect a building for him. Plaster and Union, a crafts union made up of building trades workmen, were at odds upon the issue of whether Plaster would employ union labor and the union picketed Ritter's cafe to compel Ritter to cause Plaster to hire union workmen. The only basis for saying that Ritter had any connection with the controversy between the building contractor and the union of building trades workmen was the fact that Ritter had made the contract with Plaster. The Galveston Court invoked the Texas anti-trust laws against the Union, in affirming a trial court's decree which enjoined the picketing of Ritter's Cafe. The Supreme Court held that this particular application of the anti-trust laws did not abridge the union members' right of free speech, which they purported to exercise in picketing Ritter, because Ritter's economic relation to the labor dispute was too remote. The Court did not hold that every other application which might be made of these anti-trust laws would be valid. The Court, instead, recognized economic relationship as the test for determining who were such parties to a labor dispute as might be picketed in the exercise of free speech; and the decision simply indicates the boundaries within which this test is to be applied. Said the Court, 315 U.S. 722, 62 S.Ct. at page 809, 86 L.Ed at page 1147: "Texas has undertaken to localize industrial conflict by prohibiting the exertion of concerted pressure directed at the business, wholly outside the economic context of the real dispute, of a person *whose relation to the dispute arises from his business dealings with one of the disputants.* The state has not attempted to outlaw whatever psychological pressure may be involved in the mere communication by an individual of the facts relating to his differences with another. *Nor are we confronted here with a limitation upon speech in circumstances where there exists an 'interdependence of economic interest of all engaged in the same industry' \* \*."

"It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that *directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises* leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose."

The statements underlined must be read with the court's construction of their opinion in the Wohl case, to which we now refer. Bakery & Pastry Drivers v. Wohl & Platzman, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178, was decided on the same day as was the Ritter's Cafe case. The industrial controversy, and the relationship of the parties to that controversy, are similar to those involved in the Lake Valley and Meadowmoor cases cited above. Wohl & Platzman functioned about as did the Chicago milk "vendors" but did not belong to a Union. They purchased the products of bakeries and resold them to retail merchants, who bought the product for resale to the public. The union was made up of employees of bakeries which sold their products directly to the retail merchants; Union's members performed a function similar to that of the Chicago A.F. of L. union of milk wagon drivers. Wohl & Platzman refused to become a member of the Bakery & Pastry Drivers Union and eventually refused to employ relief drivers from that union, and to compel them to do so the union undertook to picket Wohl & Platzman by picketing bakeries which sold their products to Wohl & Platzman. (Union supported this picketing by the same argument which the Chicago A.F. of L.

Union relied upon, namely, that the system of distribution in which Wohl functioned was destroying the business of Union's employers and lowering the conditions of employment, wages, etc., of the members of Union.) They also communicated some facts concerning the dispute to some of Platzman's customers and threatened to picket at least one of them, and at the suit of Wohl & Platzman, picketing of the bakery and of the retail purchasers was enjoined by the New York courts. The Supreme Court reversed this decree. The majority opinion seemingly assumes that there was a valid labor dispute, or controversy before to the Court, to which the bakery vendors of Wohl & Platzman and Wohl & Platzman's retail outlets were parties, and were thus subject to being picketed in the exercise of free speech. The following quotation from the majority opinion in the Ritter's Cafe case, which is to be read with the italicized statements we have already quoted from the Ritter's Cafe case, expresses this construction of the Wohl decision. Said the court in the Ritter's Cafe case, 315 U.S. 722, 62 S.Ct. at page 810, 86 L.Ed. at page 1147, majority opinion: "The line drawn by Texas in this case is not the line drawn by New York in the Wohl case. The dispute there related to the conditions under which bakery products were sold and delivered to retailers. The business of the retailers was therefore directly involved in the dispute. In picketing the retail establishments the union members would only be following the subject-matter of their dispute. Here we have a different situation." The language brings to mind the decision of the New York Court of Appeals in Goldfinger v. Feintuch, supra.

Under the line of decisions which we have discussed, former distinctions made between primary and secondary picketing have ceased to be valid. A distinguished commentator has this to say of these decisions from p. 92 of the 1947 Supplement to Teller's Labor Disputes, by Ludwig Teller:

"To the extent that labor unions follow the subject matter of the dispute, they may engage in secondary picketing but only within the industry of the primary contro-versy. The Wohl and Ritter's Cafe cases regard picketing under such circumstances as a constitutional right resulting from the present degree of the identification of picketing with free speech. The Supreme Court has thereby appreciably enlarged the right to picket because the courts of a number of states have heretofore denied to labor the right either to engage in secondary picketing generally, or to establish a picket line at the premises of a retailer purchasing goods from a manufacturer or wholesaler engaged in a labor dispute with the picketing union. State decisions have rested upon the asserted ground that the retailer or other third party is a neutral to the labor dispute. Clearly he is not. There is a basis for labor's claim that he is the beneficiary of the protested sub-standard or unfair working conditions; in any event, by his patronage he sustains the business of the establishment involved in the primary dispute and thereby combats the union's efforts to injure that business by legitimate labor activity."

Similar conclusions have been arrived at in the following decisions: People v. Muller, 286 N.Y. 281, 36 N.E.2d 206, 136 A.L.R. 1450, by the N. Y. Court of Appeals; Mason & Dixon Lines, Inc., v. Odom, 193 Ga. 471, 18 S.E.2d 841, by the Supreme Court of Georgia; Ellingsen v. Milk Wagon Drivers Union, 377 Ill. 76, 35 N.E.2d 349, by the Supreme Court of Illinois; And see Alliance Auto Service Co. v. Cohen, 341 Pa. 283, 19 A.2d 152, by the Supreme Court of Pennsylvania.

According to the authorities discussed above, plaintiffs bore such an economic relation to Heisig and Union as to be such parties to the labor dispute between Heisig and Union, that Union in the exercise of their right of free speech under the 14th Amendment, had the right to picket plaintiffs' depot, at least to the extent of advertising plaintiffs' relation with Heisig and the facts concerning the dispute with Heisig. Note particularly the form of the statements appearing upon the pickets' placards referred to in Goldfinger v. Feintuch, 276 N.Y. 281, 11 N.E.2d 910, 116 A.L.R. 477; Alliance Auto Service Co. v. Cohen, 341 Pa. 283, 19 A.2d 152; and Bakery & Pastry Drivers Union v. Wohl

& Platzman, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178. Our findings show that Union's picket placards did not go so far as this.

(4) Plaintiffs argue that the picketing of their depot constitutes "secondary picketing" within the meaning of Art. 5154f, Vernon's Texas Statutes 1948, and is therefore subject to be enjoined.

We need not determine whether this statute applies to this case or not; its applicability is certainly questionable. The definitions of *employer* and *employee* do not fix the position of an *agent* with certainty and the definition of *secondary picketing* raises the question, whether it was meant to be applied to a site which constitutes a place of business and work of the employes and employer involved in the dispute, and which is also a place of business and work of other employes and employer.

If the statute be applicable to this case, it cannot be given effect. For the Legislature's determination of who may be lawfully picketed as an incident of a strike is not final, and under the decisions of the U. S. Supreme Court and under other decisions listed above, the plaintiffs, Heisig and Union were all parties, by reason of their economic relation, to a labor dispute, concerning which the Union had the right under the 14th amendment to publish the facts through pickets established at plaintiffs' depot; and if the aforesaid provisions of Art. 5154f have any application to the picketing of plaintiffs' depot, they unduly abridge the right of free speech of Union's members, violate the 14th amendment to the Federal Constitution, and are thus of no effect.

(4) Plaintiffs also argue that the picketing of the depot constitutes a "secondary boycott" within the meaning of Section (e) of Art. 5154f, and that it constitutes a violation of various provisions of the Texas anti-trust statutes. We need not adjudicate the argument; these statutes can not be constitutionally applied to the picketing done at plaintiffs' depot, for reasons heretofore stated.

(5) Plaintiffs also argue that Union's purpose in picketing the depot is unlawful because it was to compel plaintiffs to breach their contract with Heisig.

We have touched on this matter in Article VII of our Conclusions of Fact. There are Texas decisions which hold that if picketing interferes with the performance of a contract between the picketed employer and employees of his, the picketing may be enjoined. See, by the Galveston Court of Civil Appeals: Henke & Pillot v. Amalgamated Meat Cutter, Tex. Civ.App., 109 S.W.2d 1083; Texas Motion Picture and Vitaphone Operators v. Galveston, etc., Operators, Tex.Civ.App., 132 S.W.2d 299; International Ass'n of Machinists v. Downtown Employees, Tex. Civ.App., 204 S.W.2d 685. None of these decisions is precisely in point on the facts because Union was not attempting to displace Heisig. In Turner v. Zanes, Tex. Civ.App., 206 S.W.2d 144, by the Dallas Court of Civil Appeals, reference is made to contracts between a local pick-up and delivery carrier and various railroads and trucking lines, but the terms of the contracts are not set out and the facts before the Dallas Court show a great deal more than the picketing shown by this record.

In view of these decisions, we shall dispose of the argument upon the assumption that it was always at least one of Union's motives in establishing the picket lines to exert pressure upon plaintiffs to compel plaintiffs to use their influence with Heisig in Union's behalf.

We think the contract between plaintiffs and Heisig is irrelevant to the issues raised on this appeal. As stated in Article VII of our findings, Union was attempting to make an agreement with Heisig; and considering original motives, desired of plaintiffs no more than an effort by plaintiffs to cause Heisig to come to an agreement with Heisig. Of course, if Heisig nevertheless declined to agree, then doubtless, Union wanted some one in Heisig's place with whom they could deal and who would employ union labor. We think, however, that such a purpose on the part of Union raises an issue different from that raised by a purpose to displace Heisig *in any event*, with some one else; the issue raised by Union's purpose

is simply whether Union can picket at plaintiffs' depot to compel plaintiffs to assist them in bringing Heisig to terms, not whether Union can do this to compel the termination of Heisig's contract. We think, furthermore, that the issue raised by Union's purpose is to be resolved in Union's favor because plaintiffs were parties to the labor dispute Union has with Heisig and because plaintiffs' depot is one of the physical scenes of this dispute. The resulting injury to plaintiffs is damnum abseque injuria, and the force exerted upon plaintiffs was lawful. To hold otherwise would enable one of the parties to a labor dispute to insulate himself from the dispute under any and every circumstance by making a term contract with one of the other parties. It can more properly be held that the contract was entered into subject to the possibility of a labor dispute arising. At any rate, this court in Thomas v. International Seamen's Union, Tex.Civ. App., 101 S.W.2d 328, seems to have attached no significance to the existence of contracts between the Union rebelled against and their employers. Nor did the U. S. Supreme Court in Journeymen's Tailors Union v. Millers, Inc., 312 U.S. 658, 61 S.Ct. 732, 85 L.Ed. 1106, a memorandum opinion reversing the New Jersey Courts' decree enjoining the picketing of Millers, Inc. The New Jersey opinions are reported at N.J.Ch., 15 A.2d 822 and 128 N.J.Eq. 162, 15 A.2d 824. These opinions show that upon the expiration of a term contract between Millers, Inc., and the Journeymen (a C.I.O. union), under which Millers agreed to employ only members of Journeymen, Millers had immediately made a contract with an A.F. of L. union, agreeing to employ only its members. The Journeymen then picketed Millers. The New Jersey courts held that the Journeymen could not picket Millers to secure a new contract with Millers, and the Supreme Courts' reversal of the New Jersey decree necessarily holds the exclusive contract of the A.F. of L. union was immaterial. The Supreme Court opinion cites A.F. of L. v. Swing, Thornhill v. Alabama, and Carlson v. California, all cited above. We note that in the Swing case the non-union employees of Swing

were parties plaintiff, and that no significance was attached to whatever arrangement they may have had with Swing; although they would either have had to quit Swing's employ or join the Union. The nature of their employment contracts was not disclosed, and these may not have been term contracts. We note also that in the Lake Valley case cited above the Court thought it a lawful purpose of the A.F. of L. union of milk wagon drivers to attempt the destruction of the "vendor" system of milk distribution, which was about to destroy their own system and the rights and standards they had hitherto attained in behalf of their members. We note further that the decision in the Ritter's Cafe case was placed upon the ground that Ritter was not a party to the labor dispute (or that his relation to that dispute was so remote that Texas could protect him against incidents of that dispute); Ritter's contract with Plaster for the erection of a building was not referred to as a ground of the decision. Under these decisions plaintiffs' contract with Heisig entitles them to no relief. Our holding is limited to the facts before us.

(6) Plaintiffs refer to the damage done to their business by Union's picketing at their depot. The matter has been discussed and decisions have been cited which show that under the circumstances of this case this damage affords plaintiffs no ground for relief.

(7) The American Federation of Labor, as amicus curiae, suggests that the Texas statutes on which plaintiffs have relied cover matters which Congress has now brought under Federal regulation, and are therefore of no force.

The matter need not be discussed since plaintiffs have claimed no violation of or rights under Federal law. And see Ex Parte Henry, Tex.Sup., 215 S.W.2d 588, page 595.

(8) We have given some consideration to the interference with plaintiffs' obligations as carriers which has resulted from Union's picket and to the interference with interstate commerce which we may assume had either occurred or would occur in the future. The parties make no

point of these matters and we have concluded that plaintiffs are entitled to no relief by reason of these matters.

(9) These comments dispose of defendants' other Points of Error, to which we have not referred, and require that the trial court's decree be reversed.

The decree of the trial court is accordingly reversed, and the injunction awarded therein is dissolved.

### On Motion to Dismiss.

Since we overruled their motion for rehearing, appellees have filed a motion alleging that the cause is moot and praying that our judgment and the order overruling the motion for rehearing be set aside and that the cause be dismissed. For grounds, appellees allege that 9 days after this cause was submitted, before this cause was decided, "the contract shown in the record here to have existed between appellees and Heisig Transfer & Storage Company for pick up and delivery service was terminated, and thereafter, on November 29, 1948, the Ace Cartage Company, a different concern entirely from Heisig Transfer & Storage Company, became the pick up and delivery contractor of appellees, and has continued at all times since that time to be such pick up and delivery carrier and Heisig has never, since such time of November 27, 1948, had any contract for such pick up and delivery service for appellees, or has since that time performed any such duties, or had any place of business in connection therewith at appellees' freight terminal or depot."

Both motion and reply are verified.

The motion is overruled on the following grounds:

(1) No material relief will be afforded appellees if their motion is granted. Appellees brought the suit to restrain certain conduct of appellants, and were granted an injunction by the trial court which we have dissolved, without remanding any phase of the litigation. So far as relief on the merits is concerned, such a judgment is about the equivalent of the dismissal of their suit for which appellees now pray. See: Greenwood v. City of El Paso, Tex.Civ.App., 186 S.W.2d 1015,

at page 1018. We attach no significance, on this appeal, to the fact that the dismissal would be without prejudice, nor to the fact that appellees are now charged with liability for all costs. Under the circumstances appellees ought to pay the costs. Rule 448, Texas Rules of Civil Procedure, concluding sentence. Also, see: Service Finance Corporation v. Grote, 133 Tex. 606, 131 S.W.2d 93; International Association of Machinists v. Federated Association, 133 Tex. 624, 130 S.W.2d 282. In Little v. Bowers, 134 U.S. 547, 10 S.Ct. 620, 33 L.Ed. 1016, the time within which an application might be made for dismissal of the cause, as being moot, was declared to be at an end with the decision of the cause. Said the court 134 U.S. 547, 10 S.Ct. at page 623, 33 L.Ed. at page 1021: "The fact that there is no controversy between parties to the record ought, in the interest of a pure administration of justice, to be allowed to be shown at any time *before the decision of the case.*" Courts of Civil Appeals have refused to dismiss the cause where the application was filed after the court had arrived at a decision of the appeal. Boyd v. Adcock, Tex. Civ.App., 21 S.W.2d 743; Martinez v. Kilday, Tex.Civ.App., 117 S.W.2d 151. The first of these cases involved only a temporary injunction; whether the second involved more is not clear. Cases may arise in which this court, whether because our jurisdiction is not final (it is not final here) or for other reasons, ought not to abide by the time limit set in these decisions; but we think that we ought to do so under the circumstances to which we have referred above.

(2) This cause is not moot in the sense that a cause becomes moot by expiration of time or by destruction of the subject matter. Appellees do not say that the industrial dispute between Heisig and appellants has ended. They only say, in legal effect, that they are no longer parties to this dispute and thus there is no lawful ground for appellants' picketing of them. Decision of their motion depends upon our resolution of the point of law made by this argument; and the issue so raised has the look of a justifiable claim for equitable relief by reason of changed conditions which ought to be presented first to the trial court.

Barnsdall Oil Co. v. Railroad Commission, Tex.Civ.App., 83 S.W.2d 714. Certainly the trial court can grant relief if conditions have changed and if Union continues to picket appellants despite the change of conditions. It may be that we have authority to determine the issue raised by appellees' motion; but since we have already decided the cause before us, and since the trial court can develop the proof and give appellees necessary relief if they need it and are entitled to it, regardless of what we do here, and since an order granting appellees' motion might have some effect upon the future conduct of the parties and the adjudication of future litigation between them in the trial court, and since appellants contest the motion, we think that we ought to let our judgment stand.